UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v

    Case No. 17-cr-20183-1

    HON. MARK A. GOLDSMITH

D-1 DARRICK DERNARD BELL,

    Defendant.
_____/

# OPINION & ORDER
## DENYING DEFENDANT'S MOTION FOR PRETRIAL RELEASE (Dkt. 418)

This matter is before the Court on Defendant Darrick Dernard Bell's motion for pretrial release (Dkt. 418). Bell contends that the factors set forth in 18 U.S.C. § 3142(g) weigh in favor of his release, given the health risks presented by his continued incarceration during the COVID-19 pandemic. A grand jury indicted Bell on eleven charges stemming from his alleged role in an extensive human trafficking and drug-distribution conspiracy at the Victory Inn hotel (the "Victory Inn") on Michigan Avenue in Detroit, Michigan. Superseding Indictment (Dkt. 98). Ten of the charges carry a statutory presumption of detention. Considering the factors set forth in 18 U.S.C. § 3142(g), this Court finds that Bell has not rebutted the presumption of detention and denies his motion for pretrial release.

## I. BACKGROUND

After Bell was arrested in August 2019, he consented to detention pending trial. See Consent Order of Detention Pending Trial (Dkt. 317). Although neither of the parties proffered evidence in connection with Bell's present motion, the Court has previously evaluated evidence proffered by the Government in connection with co-Defendants Tawfik's and Nero's motions for pretrial release. See Op. & Order Denying Tawfik's Request for Pretrial Release at 2-7. (Dkt. 48);

Op. & Order Denying Nero's Mot. for Revocation of Detention Order at 1-5 (Dkt. 183). This evidence included video clips from the Victory Inn's surveillance system, screen shots from the Government's pole camera video, and victim and witness statements, and much of the evidence concerns Bell's role in the alleged conspiracy. The Court's previous discussion of this evidence is included in relevant portion below.

### A. The Initial Investigation and Surveillance

The federal investigation began in September 2016, when a human trafficking and heroin overdose victim ("Victim 1") told federal agents from Homeland Security Investigations ("HSI") about a conspiracy for the sale of women and drugs at the Victory Inn, orchestrated by Bell, a convicted murderer and drug dealer with several firearms convictions. Victim 1 stated that she had swallowed the drugs to avoid detection, as ordered by Bell, leading to her emergency room conversation with HSI agents.

In subsequent interviews, Victim 1 confirmed that Bell is the leader of the conspiracy, that he uses drugs to coerce the human-trafficking victims, and that she was terrified of his physical assaults. Victim 1 said that the Victory Inn staff was part of the conspiracy and would direct sex dates to certain rooms.

Another human trafficking victim ("Victim 2") described an extensive drug and human-trafficking operation headed by Bell, in which she and other women had been held against their will for several weeks. Victim 2 stated that the conspirators forced women to perform sex acts for money in exchange for a room at the Victory Inn and for drugs to support their addictions. Victim 2 said that the Victory Inn staff was complicit in the criminal activity, and that they only use a handful of rooms at the hotel for legitimate customers.

On November 3, 2016, Detroit Police and Detroit EMS responded to a female drug overdose victim ("Victim 3") in room 118 at the Victory Inn. While assessing Victim 3, Detroit Police talked to co-Defendant Terry Pruitt at the door of room 118. On a Detroit Police bodycam video, Pruitt casually discusses the fact that he can procure prostitutes for customers.

On November 4, 2016, Detroit police spoke to a female victim ("Victim 4") at a gas station near the Victory Inn. Victim 4 stated that she was a prostitute who lived at the Victory Inn and that Bell frequently delivered drugs to the hotel. A few days later, HSI installed a nearby pole camera to conduct surveillance on the Victory Inn.

In early December, Detroit Police began conducting surveillance at the Victory Inn along with HSI. They observed dozens of apparent hand-to-hand drug deals and commercial sex dates in several different rooms. The police performed traffic stops on several customers who left after short stays, three of whom attested to rampant drug and prostitution activity at the Victory Inn.

Another female victim ("Victim 6") was apprehended after attempting to flee the Victory Inn. She admitted that she was a frequent resident of the Victory Inn and to prostituting herself at the hotel. Victim 6 stated that there are as many as 20 female sex workers at the Victory Inn, and that the pimps work for Bell. She also said that Bell delivered narcotics to the hotel daily and collected cash from the previous day's narcotics sales. Victim 6 further stated that Bell beat to death a female known as "Juicy" for failing to pay her drug debt.

On December 26, 2016, Dearborn Police responded to a drug overdose call for a woman at the Best Value Inn hotel in Dearborn, Michigan, which is a few blocks from the Victory Inn. The female victim ("Victim 7") died at the scene. Victim 7's boyfriend stated that she had ingested drugs that they had purchased that day at the Victory Inn.

On December 29, 2016, another reliable confidential informant told police that multiple

people were selling drugs and "pimping" women at the Victory Inn.

**B. The January 2017 Search Warrant**

On January 12, 2017, at 6:00 a.m., HSI and local police executed a federal search warrant for twenty-five rooms at the Victory Inn. During the execution, agents rescued fourteen lethargic female human-trafficking victims who were suffering from drug withdrawal in disheveled rooms. They arrested co-Defendant Michael "Man" Randol after he tossed 35 grams of crack cocaine from a room window. Agents also recovered one loaded firearm, narcotics, narcotics paraphernalia, and dozens of cell phones. Most of the hotel rooms contained extensive evidence of recent drug use (e.g., used needles, used baggies, etc.). Agents also seized the Victory Inn's encrypted video surveillance data from the hotel's cameras, and records including thousands of handwritten room receipts.

After rescuing the human-trafficking victims from the Victory Inn, agents were able to interview some of them, who confirmed that Bell and the other co-Defendants controlled, directed, and participated in the drug distribution and prostitution schemes at the Victory Inn. Multiple victims stated that they were abused.

**C. The Evidence from the Victory Inn**

Preliminary review of the pole camera video and pictures shows a massive volume of apparent hand-to-hand drug and commercial sex transactions from almost every Victory Inn room across a period of two months.

Agents also recovered approximately 14,300 hours of encrypted video from the Victory Inn's thirteen surveillance cameras. According to agents' review, the video shows hundreds of drug transactions; widespread prostitution; violence; and members of the conspiracy involved in these activities. Eleven video clips from this initial sample appear to reveal drug transactions,

4

forcible movement of human-trafficking victims, and drug use (including at least one apparent overdose that lasted a considerable amount of time yet went unaddressed).

### D. Bell's Criminal History

Bell has three felony weapons convictions, two felony controlled-substance convictions, an assault-with-a-dangerous-weapon conviction, and a murder conviction.

After the initial indictment in the present case was unsealed in March 2017, Bell absconded. The United States Immigration and Customs Enforcement ("ICE") added Bell to its Most Wanted List and conducted a large-scale manhunt for Bell. See Most Wanted List, available at https://www.ice.gov/most-wanted/darrick-bell (last visited on Apr. 1, 2020). After over two years on the run, Bell was finally apprehended in August 2019.

## II. ANALYSIS

"When a 'judicial officer finds that there is probable cause to believe' that a defendant committed one of the crimes listed in section 3142(e)(3), there is a presumption in favor of detention: 'Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community[.]'" United States v. Stone, 608 F.3d 939, 945 (6th Cir. 2010) (quoting 18 U.S.C. § 3142(e)(3)). "A grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged." United States v. Hazime, 762 F.2d 34, 37 (6th Cir. 1985). "Section 3142(e)(3)'s presumption in favor of detention imposes only a 'burden of production' on the defendant, and the Government retains the 'burden of persuasion.'" Stone, 608 F.3d at 945.

"A defendant satisfies his burden of production when he 'com[es] forward with evidence that he does not pose a danger to the community or a risk of flight.'" Id. (quoting United States v.

5

Mercedes, 254 F.3d 433, 436 (2d Cir. 2001)). "Although a defendant's burden of production 'is not heavy,' he must introduce at least some evidence." Id. "Even when a defendant satisfies his burden of production, however, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id. "The presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." Id. "To rebut the presumption, therefore, a defendant should present all the special features of his case that take it outside the congressional paradigm." Id. at 946.

Here, the grand jury found probable cause and indicted Bell for seven sex-trafficking charges (Counts 1, 3, 4, 5, 6, 7, and 8). See Superseding Indictment. Each of these is an offense under Chapter 77 of Title 18, United States Code, with a maximum term of imprisonment of 20 years or more, and triggers a rebuttable presumption in favor of detention pursuant to 18 U.S.C. § 3142(e)(3)(D). The grand jury did the same for Bell's controlled-substance distribution crimes (Counts 11, 15, and 17). See Superseding Indictment. Each of these has a maximum term of ten years or more; these counts carry their own separate presumption in favor of detention under 18 U.S.C. § 3142(e)(3)(A).

Applying the § 3142(g) factors below, the Court finds that Bell has failed to rebut the presumption of detention. Indeed, Bell offers no argument or evidence regarding these factors, and instead contends that his release is warranted in light of the COVID-19 pandemic.

**A. Nature and Circumstances — 18 U.S.C. § 3142(g)(1)**

Title 18 U.S.C. § 3142(g)(1) states:

> (g) The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the

> community, take into account the available information concerning—
>
>> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device.

The Government's proffer—based on several witness statements and the videos—and the grand jury's indictment implicate several of the express factors under 18 U.S.C. § 3142(g)(1). These weigh heavily in favor of detention.

First, Counts 1, 3, 4, 5, 6, 7, and 8 all involve human trafficking in violation of Title 18 U.S.C. § 1591, which is an express factor in favor of detention under 18 U.S.C. § 3142(g)(1) ("whether the offense is . . . a violation of section 1591"). By definition, human trafficking is a violent, fraudulent, and coercive crime. See 18 U.S.C. § 1591(a) ("force, threats of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a commercial sex act[.]"). Here, multiple witnesses have stated that Bell was responsible for orchestrating and leading the conspiracy in which his co-Defendants employed beatings, various threats, degrading actions, and dangerous, addictive drugs to coerce the human trafficking victims into commercial sex acts. These witnesses alleged that Bell himself physically assaulted the human-trafficking victims, allegedly killing one female victim for failure to pay a drug debt. During the January 12, 2017 search warrant, agents rescued over a dozen lethargic and addicted female victims clustered in disheveled rooms.

Second, Counts 11, 15, 17, and 18 are controlled-substance offenses, which is another factor. See 18 U.S.C. § 3142(g)(1) ("whether the offense . . . involves a controlled substance"). The proffered evidence has shown the impressive scale of the conspiracy's drug distribution. Agents surveilled hundreds of drug transactions, and recovered extensive evidence of drug use and

distribution during the search warrant.  Several proffered witnesses stated that Bell was directly involved in the drug conspiracy and that he frequently delivered drugs to the hotel.

The Sixth Circuit "routinely affirms, on dangerousness grounds, the pre-trial detention of run-of-the-mill drug dealers, even without any indication that the defendant has engaged in violence." Stone, 608 F.3d at 947 n.6.  There is far more here than drug dealing, including strong evidence of violence, coercion, and several overdoses linked to Victory Inn drugs.  On the November 3, 2017 police video alone, co-Defendant Pruitt brazenly discusses sex trafficking while a victim overdoses inside room 118.

Finally, Bell's human trafficking and drug offenses carry stiff penalties, including mandatory terms of 15 or 20 years, and up to life in prison. These penalties reflect the serious nature of these crimes.  See, e.g., Baldwin v. New York, 399 U.S. 66, 68 (1970) ("In deciding whether an offense is 'petty,' we have sought objective criteria reflecting the seriousness with which society regards the offense . . . and we have found the most relevant such criteria in the severity of the maximum authorized penalty.").  The nature of the instant offenses, therefore, weighs heavily in favor of Bell's detention.

### B. Weight of the Evidence — 18 U.S.C. § 3142(g)(2)

Title 18 U.S.C. § 3142(g)(2) instructs this Court to consider "the weight of the evidence against the person."  The factor "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." Stone, 608 F.3d at 948; see also Hazime, 762 F.2d at 37 (weight-of-evidence factor "deals with the factors to be considered in determining whether there are conditions which will assure the appearance of the accused and safety of the community").

Here, the weight of the evidence of Bell's dangerousness and risk of non-appearance is strong. Evidence of his dangerousness includes witness statements that Bell orchestrated the conspiracy. Witnesses described the threats, physical violence, and coercion employed by the co-conspirators, under Bell's leadership, to force the human trafficking victims into commercial sex acts. Extensive surveillance video documents hundreds of drug transactions, widespread prostitution, violence, and drug use, including an apparent overdose. The witnesses further stated that Bell himself physically assaulted the human trafficking victims and allegedly killed one woman. Bell's dangerousness is further confirmed by his extensive criminal history. And evidence of Bell's risk of non-appearance includes the fact that following the unsealing of the indictment, Bell fled and evaded arrest for over two years. Accordingly, this factor strongly favors detention.

### C. History and Characteristics — 18 U.S.C. § 3142(g)(3)

Under this factor, this Court must consider the following:

> [T]he history and characteristics of the person, including—
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law . . . .

18 U.S.C. § 3142(g)(3).

As stated above, Bell has an extensive criminal history, with three felony weapons convictions, two felony controlled-substance convictions, an assault-with-a-dangerous-weapon conviction, and a murder conviction. Bell's history also reveals that he poses a significant flight

risk. Again, as described above, Bell evaded arrest for over two years, requiring large-scale search efforts and placement on ICE's Most Wanted List. Consequently, Bell's history and characteristics weigh in favor of detention.

### D. Danger to Community — 18 U.S.C. § 3142(g)(4)

Under the pertinent part of 18 U.S.C. § 3142(g)(4), this Court must consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

There is extensive evidence of Bell's leadership and organization of a large-scale drug distribution conspiracy at the Victory Inn. "To be sure, drug trafficking is a serious offense that, in itself, poses a danger to the community." Stone, 608 F.3d at 947 n.6; see also United States v. Leon, 766 F. 2d 77, 81 (2d Cir. 1985) ("the harm to society caused by narcotics trafficking is encompassed within Congress's definition of 'danger'")). Further, the grand jury indicted Bell and found probable cause that he committed seven separate human trafficking violations that required the use of "force, threats of force, fraud, [or] coercion" against his victims. 18 U.S.C. § 1591(a). At least two witnesses have reported that Bell physically abused victims and killed one. In view of this evidence, the Court is not persuaded that home confinement and electronic monitoring would adequately protect the public and ensure Bell's appearance were he to be released. As with the other § 3142(g) factors, this factor weighs in favor of Bell's detention.

### E. COVID-19

Bell contends that pretrial release is warranted in light of the health risks posed by continued incarceration during the COVID-19 pandemic. The Court is mindful of the exceptionally grave and unprecedented nature of COVID-19, which has continued to spread exponentially throughout the State of Michigan. And as acknowledged by the Centers for Disease

Control and Prevention ("CDC"), incarcerated individuals face an even greater risk of transmission, given the conditions frequently present in correctional and detention facilities. See United States v. Kennedy, No. 18-20315, 2020 WL 1493481, at *2 (E.D. Mich. Mar. 27, 2020). These conditions include, among other things, the highly congregational environment, the limited ability of incarcerated persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing), and potentially limited onsite healthcare services. Id.

While the generalized risks of COVID-19 cannot be disputed, courts evaluating whether pretrial release is necessary must evaluate the particularized risks posed to an individual defendant. United States v. Lee, No. 19-20112, 2020 WL 1540207, at *3 (E.D. Mich. Mar. 30, 2020). Some courts evaluating the impact of COVID-19 on the pretrial release calculus have considered the following four factors:

> (1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others.

United States v. Clark, No. 19-40068, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020). Although these factors have been applied in the context of motions for release under 18 U.S.C. § 3142(i), they are nevertheless relevant under the present procedural posture.[1]

First, as discussed above, the § 3142(g) factors overwhelmingly demonstrate that Bell presents a danger to the community and a risk of flight, and that no condition or combination of conditions could reasonably assure the safety of the community and his appearance in court. This

---

[1] Subsection 3142(i) provides that a judicial officer may "permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."

11

factor weighs decidedly in favor of Bell's continued detention.

Second, Bell's concerns are generalized and speculative. Bell has identified no personal health condition rendering him at greater risk of either contracting COVID-19 or developing severe complications from the virus. See United States v. Dodd, No. 20-0016, 2020 WL 1547419, at *3 (D. Minn. Apr. 1, 2020) (denying release on the grounds that the defendant had not offered evidence of a personal health condition). Accordingly, as argued by the Government, Bell "has not shown how the dynamics of the current COVID-19 situation relate to him particularly in a way that could not be said of all detainees . . . ." See id.; see also United States v. Munguia, No. 3:19-cr-191-B, 2020 WL 1471741, at *4 (N.D. Tex. Mar. 26, 2020) ("Defendant's argument applies equally to every detainee in detention; however, the Court cannot release every detainee at risk of contracting COVID-19 because the Court would then be obligated to release every detainee.").

Nor has Bell demonstrated that he has been exposed to the virus as a result of his incarceration. To the contrary, the Government responds that Jail Captain Jeff Derocher reports that no prisoners at Midland County Jail, where Bell is detained, have been diagnosed with COVID-19 as of March 25, 2020. Gov't Resp. at 10 (Dkt. 424). Further, Midland has implemented a variety of precautions in an effort to reduce the risk of COVID-19 transmission within the prison. The facility has been undergoing a heavy cleaning regimen since February 20, 2020. Id. at 12. All new inmates are being screened for fever and other COVID-19 symptoms before entering the jail. Id. If an inmate exhibits any positive symptoms, that individual would be transported directly to a local hospital. Id. Two inmates who exhibited symptoms consistent with COVID-19, including one with a pneumonia diagnosis, remain in isolation until they receive medical clearance. Id. Should any incarcerated persons develop COVID-19, the record reflects that Midland has the capacity to address the illness, as it employs an onsite nurse and doctor, and

maintains an ample supply of food and cleaning equipment. Id. at 11-12. Such measures are consistent with those recommended by the CDC. See Kennedy, 2020 WL 1493481, at *2. This factor, therefore, also weighs in favor of continued detention.

Third, Bell has not explained how his release would minimize his risk of contracting COVID-19. Although Bell proposes confinement at a family member's home, he does not explain who else will reside at or frequent the home, or identify any COVID-19 precautions being implemented there. See United States v. Smoot, No. 2:19-CR-20, 2020 WL 1501810, at *3 (S.D. Ohio Mar. 30, 2020). In contrast, the record demonstrates that access to Midland is limited and strictly enforced, thereby minimizing Bell's potential exposure to the virus. See id. This factor weighs in favor of Bell's continued detention.

Finally, Bell's release to home confinement would increase the risk of others contracting COVID-19. As other courts have recognized, "'[a] defendant who is unable to comply with conditions of release poses potential risks to law enforcement officers who are already tasked with enforcing shelter-in-place orders in many cities and counties, pretrial services officers who come into contact with the defendant for supervision, and others if that individual is taken back into custody.'" Id. (quoting Clark, 2020 WL 1446895, at *7); see also United States v. Aiad-Toss, No. 19-00521, 2020 WL 1514482, at *2 (N.D. Ohio Mar. 30, 2020) (noting that releasing a defendant to home detention and electronic monitoring unduly burdens pretrial services officers, who must perform installation and monitoring). Additionally, Bell's release may increase the risk of infection to the family members with whom he would reside. See Dodd, 2020 WL 1547419, at *3. Consequently, this factor likewise favors Bell's continued detention.

In sum, these factors do not demonstrate that Bell's pretrial release is warranted in light of the risks presented by the COVID-19 pandemic. Accordingly, the Government has proven by

13

clear and convincing evidence that Bell presents a danger to the community and a risk of flight, and that no condition or combination of conditions could reasonably assure the safety the community and his appearance in court.

### III. CONCLUSION

For the reasons discussed above, the Court finds that Bell must remain detained pending trial. Bell's motion for pretrial release (Dkt. 418) is denied.

SO ORDERED.

Dated: April 3, 2020                                 s/Mark A. Goldsmith  
    Detroit, Michigan                            MARK A. GOLDSMITH  
                                                               United States District Judge