UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                                Criminal Action No. 17-20183

vs.

                                          HON. MARK A. GOLDSMITH

D-1 DARRICK DERNARD BELL,
D-5 HAROLD LASHAWN NERO,

               Defendants.

_____/

## OPINION & ORDER
## OVERRULING IN PART AND DEFERRING IN PART DEFENDANTS' OBJECTIONS TO THE GOVERNMENT'S PROPOSED VIDEO EVIDENCE (Dkt. 709)

Defendants Darrick Dernard Bell and Harold Lashawn Nero are charged with committing and conspiring to commit sex trafficking and controlled substance offenses at the Victory Inn motel.  2d Superseding Indictment (Dkt. 681).  Previously, Bell filed a motion to exclude surveillance video evidence or, in the alternative, to order the Government to provide a foundational basis for the video evidence it intends to introduce at trial.  Bell Mot. to Exclude (Dkt. 421).  At the time, the Government had identified 33 hours of video that it was considering presenting at trial.  6/1/21 Op. at 2 (Dkt. 632).  The Court noted that "[g]iven the overwhelming magnitude of video evidence involved in this case, the Court must ensure that the presentation of this evidence to the jury is streamlined," pursuant to Federal Rule of Civil Procedure 611(a).  Id. at 3.  Accordingly, the Court granted Bell's motion in part, ordering the Government to identify and disclose to the Court and Defendants the segments of surveillance video that it intends to present at trial.  Id. at 4.

The Government has now identified and disclosed the video segments that it intends to use at trial; in total, the Government identifies approximately 3 hours and 25 minutes of video. Gov't Resp. (Dkt. 683); see also Exs. to Gov't Resp. (Dkts. 684-1–684-11). This matter is before the Court on Defendants' objections to the Government's proffered video evidence. Defs. Objs. (Dkt. 709). The Government filed a reply, Gov't Reply (Dkt. 725), and a supplemental memorandum, Gov't Supp. Mem. (Dkt. 738). For the following reasons, the Court overrules certain of Defendants' objections and declines to presently resolve the remaining objections.

## I. ANALYSIS

The Government intends to introduce surveillance video footage from November 27, 2016 to January 12, 2017 obtained from nine different surveillance cameras installed around the Victory Inn: camera one, camera five, camera six, camera eight, camera ten, and the pole camera (collectively, the "camera videos"). Gov't Resp. at 3–9.[1] Fourteen segments of footage taken from these videos depict an assault that occurred on December 12, 2016 (collectively, the "assault videos"). Id. Videos from camera one contain both video and audio, whereas the videos from the other cameras contain only video. The Government has submitted transcripts of the dialogue captured by camera one's audio. Defendants challenge the admissibility of the videos from the cameras, the assault videos, and the transcripts.

The Court's primary concern—that the Government's 33 hours of proposed video was an "overwhelming magnitude" that could prevent the case from being speedily and efficiently heard—has been largely assuaged by the fact that the Government now represents that it seeks to present only 3 hours and 25 minutes of video. Nevertheless, the Court will consider whether any

---

[1] The parties identified by number the different cameras that recorded video at the Victory Inn. The titles of the videos cited in this opinion (i.e., "CH05-2016-12-26-276") are the ones utilized by the parties.

of this video evidence should presently be excluded on the grounds put forth by Defendants.  To do so, the Court addresses Defendants' objections to the camera videos by type of objection.  The Court separately addresses Defendants' objections to the assault videos and the transcripts.

## A.  Type of Objection

The Court addresses by category Defendants' objections to the camera videos: (i) relevance; (ii) speculation; (iii) prejudice; (iv) hearsay; (v) the Confrontation Clause; (vi) authentication, foundation, and lay witness testimony; and (vii) the rule of completeness.

### i.  Relevance

"Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence[.]"  Fed. R. Evid. 401(a).  "[T]he fact [must be] of consequence in determining the action."  Fed. R. Evid. 401(b).  "In a criminal case, a fact is 'of consequence' if it makes it more or less likely that the defendant committed the charged conduct."  United States v. Hazelwood, 979 F.3d 398, 409 (6th Cir. 2020).  "Courts do not require that each piece of evidence directly prove or disprove an element of the offense."  Id. (citing 1 McCormick on Evid. § 185 (8th ed.) ("[S]ome evidence that is merely ancillary to evidence that bears directly on the issues may be admissible.")).  Rather, evidence need only be "a step on one evidentiary route to the ultimate fact."  Old Chief v. United States, 519 U.S. 172, 179 (1997).  This standard is a "lenient" one that is easily met.  Hazelwood, 979 F.3d at 409; see also United States v. Ramer, 883 F.3d 659, 681 (6th Cir. 2018) (stating that this circuit "applies an extremely liberal standard for relevancy") (punctuation modified).  Relevant evidence is admissible unless the Federal Rules of Evidence or the United States Constitution provide otherwise.  Fed. R. Evid. 402.

The Government represents that the camera videos are a "step on one evidentiary route" type of evidence: "The videos identified . . . create a mosaic of the drug and sex trafficking

conspiracies.  Instead of small pieces of colored stone, this mosaic consists of short videos, recorded over 46 days.  An individual video, in isolation, does not show the whole picture.  But, when put together, the videos provide a clear picture of both the drug and sex trafficking conspiracies."  Gov't Resp. at 2.  The Court agrees.  Collectively, the videos demonstrate that it is more likely than not that: (i) an underlying agreement and conspiracy between Defendants and their coconspirators—to traffic women and drugs at the Victory Inn—existed; (ii) sex trafficking occurred at the Victory Inn; and (iii) drug trafficking occurred at the Victory Inn.

To explain its conclusion, the Court addresses and rejects in turn several reoccurring relevancy objections, which include objections to videos depicting: (i) conspiracy members walking in and out of rooms; (ii) large amounts of cash; (iii) non-conspiracy members entering rooms; (iv) hand exchanges; (v) intoxicated individuals; (vi) firearms; (vi) Nero striking women; and (vii) unidentified individuals.  The Court then addresses and rejects several relevancy objections that Defendants raise as to specific videos.

### a.  Conspiracy Members Walking In/Out of Rooms

Defendants object to videos depicting alleged conspiracy members walking in and out of rooms at the Victory Inn because these actions are "not against the law" nor "evidence of a crime."  See, e.g., Defs. Objs. at 20 (referencing CH05-2016-12-26-276).  Defendants downplay the significance of these videos.  The purpose of these videos, according to the Government, is to help establish that certain rooms at the Victory Inn—particularly, Room 203 (allegedly controlled by coconspirator Bryant Daugherty) as well as Rooms 213 and 214 (allegedly controlled by coconspirator Shelvie Lewis Avery)—were used by the conspiracy members to traffic drugs and women.  Gov't Reply at 2.  The Government represents that these videos will be corroborated by "testimony that drug trafficking occurred in Daugherty's and Avery's rooms."  Id. at 20.  Thus,

although these videos do not, alone, prove the existence of drug or sex trafficking conspiracies, they are relevant as "link[s]" in the "chain of proof." Great Lakes Anesthesia, PLLC v. State Farm Mut. Auto. Ins. Co., Nos. 11-10658, 11-11003, 11-11855, 2011 WL 4507417, at *5 (E.D. Mich. Sept. 29, 2011). Accordingly, they will not be excluded on relevancy grounds.

### b.  Large Amounts of Cash

Defendants argue that videos depicting conspiracy members with large amounts of cash are irrelevant. See, e.g., Defs. Objs. at 11 (referencing CH01-Item 393). However, assuming that the Government will provide evidence that drug trafficking is "generally a cash business," then the conspiracy members' possession of large amounts of cash makes it "at least slightly more probable" that there existed a conspiracy to sell and distribute drugs. United States v. Whittington, 455 F.3d 736, 738 (6th Cir. 2006).

Conspiracy members' possession of large amounts of cash is "especially" probative if the conspiracy members were "known to have been unemployed at time of those [large cash] encounters." Id.  The Government represents that, other than coconspirator Jannette Gaggo Tawfik, who was employed by the Victory Inn at the time of the alleged offenses, all of the other conspirators were unemployed. Gov't Reply at 10. Defendants argue that Tawfik's collection of money around the Victory Inn, "without more evidence, is not relevant to the conspiracy" because Tawfik could have been merely collecting hotel payments from legitimate customers. Defs. Objs. at 16. However, the Government intends to introduce other videos and evidence to establish Tawfik's membership in the conspiracy. Thus, videos depicting Tawfik and other conspiracy members with large amounts of cash have at least some tendency to make the existence of a drug trafficking conspiracy more probable. These videos, therefore, will not be excluded on irrelevancy grounds.

### c.  Non-Conspiracy Members Entering Rooms

Defendants object to videos depicting non-conspiracy members entering conspiracy members' rooms at the Victory Inn.  See, e.g., Defs. Objs. at 17, 26 (referencing CH05-2016-12-11-103, CH05-2016-12-11-105, CH08-Item 3, CH08-Item 4).  Defendants argue that such videos do not prove that the conspiracy members' rooms were used for illicit purposes.  However, high-volume foot traffic consisting of short visits at a location can be indicative of drug trafficking at that location.  See United States v. Roberson, 332 F. App'x 290, 295 (6th Cir. 2009).  As the Government notes, the rooms allegedly controlled by two coconspirators, Avery and Daugherty, experienced high-volume foot traffic.  Gov't Reply at 13.  For instance, on January 3, 2017, at 4:30 a.m., six people entered Daugherty's room, and on January 6, 2017, from 12:19 a.m. to 10:38 p.m., over 25 people entered Avery's room.  Id.  Further, many of the visits to these rooms were short in duration, and the Government represents that it will elicit testimony at trial to show that "'short stays' are, in part, indicative of drug trafficking."  Id. at 19.

Likewise, the Government intends to use videos of women entering and exiting rooms allegedly controlled by conspiracy members to show that a "significant number and frequency of women . . . had access to rooms 213 and 214, rooms controlled by . . . Avery," which shows that Avery's use of his rooms was "incongruous with the customary use of a hotel room and more comparable to a store open for business" and is, therefore, "evidence proving the existence of the sex trafficking scheme."  Gov't Summary of Camera 8 at PageID.3956 (Dkt. 684-5).  Of course, "[i]n isolation, one woman walking into a room [controlled by Avery] at 4:15 a.m." would not be probative of a sex trafficking conspiracy; however, the fact that, for instance, six women entered or exited a room under Avery's control between 1:47 a.m. and 11:33 a.m. on one day at least slightly increases the likelihood that these rooms were being used for sex trafficking.  See Gov't

Reply at 4–5. The Court agrees that, although the fact that one woman enters a room is unremarkable, a high number and frequency of female visitors—particularly during late night or early morning hours—makes it at least somewhat more probable that Avery's rooms were used for sex trafficking.

Assuming that the Government introduces appropriate corroborating evidence, the videos depicting individuals entering rooms controlled by conspiracy members will not be excluded on irrelevancy grounds.

### d. Hand Exchanges

The Government represents that "testimony at trial will establish that [Nero and Daugherty] . . . both sold and facilitated the sale of drugs at the Victory Inn on behalf of the drug trafficking conspiracy." Gov't Reply at 19. The Government also intends to introduce video evidence that, according to the Government, shows Nero and Daugherty engaging in hand-to-hand drug transactions at the Victory Inn. Defendants object to the relevancy of these videos, arguing that the items being exchanged in the videos are unclear, and, therefore, the Government cannot use these videos to prove that conspiracy members distributed drugs at the Victory Inn. See, e.g., Defs. Objs. at 21 (referencing CH05-2016-12-27-290).

Depending on the other evidence presented at trial, the jury could reasonably infer that these videos depict drug transactions. For instance, the Government could elicit testimony to show that the manner of packaging of the substances (i.e., plastic wrap) is indicative of a drug sale. See United States v. $ 99,990.00 in Currency, 69 F. App'x 757, 763 (6th Cir. 2003). As Defendants concede, in at least some of the videos, it appears that the exchanged substance is contained in plastic wrap. See, e.g., Defs. Objs. at 21. Additionally, at least some of the videos depict individuals handing something back (such as cash) to a conspiracy member in exchange for the

substance.  If the Government elicits testimony showing that drug trafficking is "generally a cash business," then the exchange of cash for the substances makes it "at least slightly more probable" that the videos are depicting drug sales.  See Whittington, 455 F.3d at 738.

Accordingly, at this juncture, the Court declines to exclude the hand exchange videos on irrelevancy grounds.

### e. Intoxicated Individuals

The Government seeks to introduce videos depicting intoxicated people in the proximity of the Victory Inn rooms where conspiracy members allegedly sold drugs, under the theory that the congregation of intoxicated people in a certain area makes it more probable that drugs were sold at that place.  See Gov't Reply at 12.  Defendants object to these videos, arguing that the Government cannot show that the individuals depicted are actually intoxicated, or that they were under the influence of drugs (as opposed to, for instance, alcohol obtained from the bar near the Victory Inn).  See, e.g., Defs. Objs. at 23 (referencing CH05-2017-01-02-384-4).

Contrary to Defendants' position, one's state of intoxication is deducible from external observation.  Upon viewing the videos, any lay person—including the jury members—would be perfectly capable of assessing whether the individuals depicted in the videos appear to be under the influence of alcohol or drugs.  See Simmons v. Napier, 626 F. App'x 129, 137 (6th Cir. 2015) (noting that, because whether an individual is intoxicated is "considered to be a matter of common knowledge," lay people are able to determine, based on observations of the individual's behavior, whether the individual was intoxicated) (punctuation modified, citation omitted).

The videos depicting intoxicated individuals are just one link in the chain of proof that certain Victory Inn rooms were used for drug distribution.  The Government represents that the conclusion that it asks the jury to draw from these videos (that the rooms were used for drug

8

trafficking) will be bolstered by testimony showing that individuals under the influence were attracted to Daugherty's and Avery's rooms because these were the rooms "where the lion's share of the drugs were distributed." Gov't Reply at 12. For instance, the Government intends to elicit testimony from one of the intoxicated individuals depicted in five of the 17 videos portraying intoxicated individuals. Id. The Government anticipates that this individual will testify that "as an avid drug user, she purchased drugs from coconspirators at the Victory Inn" and that while under the influence she was "drawn to Avery's and Daugherty's rooms like bees to honey." Id. Given this corroborating testimony, the videos showing individuals under the influence of drugs near Daugherty's and Avery's rooms at least somewhat increase the likelihood that those rooms were used for drug trafficking.

Accordingly, the Court declines to exclude videos of intoxicated individuals on irrelevancy grounds.

### f. Firearms

Defendants object to several videos that depict conspiracy members with firearms. See, e.g., Defs. Objs. at 50, 56–57 (referencing CH08-Item 298, CH09-Item 2016-12-16-18-33-15-1). Defendants contend that these videos do not prove that the conspiracy members used the firearms to enforce the drug and sex trafficking conspiracies; at most, the videos show that various conspiracy members used firearms in situations involving personal "beef." See id. at 50. This argument is unpersuasive. The Government intends to "provide expert testimony linking firearms to drug trafficking." Gov't Reply at 9. Such testimony will likely be admissible, given that "[m]ost courts have taken a very tolerant view of the admissibility of expert testimony linking the presence of firearms to drug trafficking activities . . . ." United States v. Thomas, 99 F. App'x 665, 669 (6th Cir. 2004). In conjunction with this testimony, the Government may well be able to establish that

9

the videos showing conspiracy members' use of firearms make it at least somewhat more probable than not that a conspiracy to distribute drugs existed.  As a result, the Court will not presently exclude this evidence as irrelevant.

### g.  Nero Striking Women

Defendants object to videos showing Nero striking women, arguing that without "context" as to why the "assault[s] took place," the videos are irrelevant.  See, e.g., Defs. Objs. at 21–22 (referencing  CH05-2016-12-27-292;  CH05-2016-12-28-297).   The Government  contends that "Nero has been identified by multiple witnesses as an enforcer for both the drug and sex trafficking conspiracies," and, therefore, he struck women as part of his role as an enforcer.  Gov't Summary of Camera 5 at PageID.3932 (Dkt. 684-2).  For instance, the Government contends that one such video shows Nero striking a woman who was "engaged in commercial sex acts for the members of the conspiracy."  Id.  Thus, taken in conjunction with witness testimony and other evidence, the videos showing Nero striking women make it at least slightly more likely that Nero was involved in the conspiracies through his role as an enforcer.  Accordingly, these videos will not be excluded as irrelevant.

### h.  Unidentified Individuals

Defendants object to certain videos depicting unidentified individuals.  The unidentified individuals in the videos include individuals who entered or exited the rooms allegedly used for sex or drug trafficking; individuals involved in the alleged hand-to-hand drug transactions; individuals assaulted by conspiracy members; and individuals who discuss matters relating to the conspiracies with front desk clerks, such as Tawfik.  Specifically, Defendants contend that the Government's agents cannot testify as to the intention of the unidentified individuals in the videos

10

and, without knowing these individuals' intentions, the relevance of the videos cannot be determined. See, e.g., Defs. Objs. at 6–7 (referencing CH01-Item 201).

Defendants' assumption—that the Government will need to prove the mental intent of the unidentified individuals in order for these videos to be relevant—is incorrect. For instance, for relevancy purposes, the Government need not prove the exact mental intent of every unidentified individual that visited a certain room for a short amount of time. This is because the mere fact that rooms were frequently visited by unidentified individuals for short periods of time makes it at least slightly more probable that the rooms were used for drug trafficking. Likewise, for relevancy purposes, the Government need not prove that intoxicated individuals observed near Daugherty's or Avery's rooms went to these locations with the intent to purchase drugs. This is because the mere fact that the presence of a significant number of individuals under the influence near these rooms makes it more probable that the rooms were used for drug trafficking.

Defendants' relevancy objections to these videos are, therefore, overruled.

### h. Specific Objections

The Court addresses several relevancy-based objections to specific videos.

First, Defendants argue that one video containing "discussions of a bbq and rent" is irrelevant. Id. at 8 (referencing CH01-Item 240). This description is misleading. The only conversation about rent is at the very beginning of the video when Avery enters the Victory Inn's lobby and gives a package of food to Tawfik, who is also in the lobby; in response, Tawfik asks if Avery's giving of food means that his rent is going to be late. See CH01-Item 240. The rest of the video contains (i) a discussion wherein Tawfik tells Avery about "fighting over hoes" and that "[t]here's enough puss poofs . . . to go around"; and (ii) an angry confrontation in the lobby between Daugherty, Avery, and coconspirator Michael Anthony Randol, wherein Daugherty tells

Avery and Randol: "Don't try to cross me cause we supposed to be a team.  I'll kill for you like I kill for them, like I'll kill for anybody like I love for."  See id.  At the end of the video, Tawfik informs the men that "Tone" (an alleged nickname for Bell) is cooking out back.  See id.  As the Government states, this video is relevant because, "[t]aken in conjunction with witness testimony and other videos, this video tends to make the existence of [the following] facts of consequence [more likely] . . . : (1) the association of Bell, Avery, Randol, and [Tawfik]; (2) Avery, Randol, and [Tawfik] are involved in the sex trafficking conspiracy ([Tawfik's] statement that there are enough prostitutes to go around); (3) Randol is an enforcer for the members of the drug and sex trafficking conspiracies; and (4) that to accomplish the goals and objections of the conspiracy, members of the conspiracies utilized threats of force and actual force and violence . . . ."  Gov't Summary of Camera 1 at PageID.3906 (Dkt. 684-1).  The brief mention of rent is at least somewhat probative of an association between Avery and Tawfik, just as the brief mention of the cookout is at least somewhat probative of an association between Bell, Avery, Randol, and Tawfik.

Second, Defendants object to the relevancy of a video wherein "[a]n unknown woman" in the Victory Inn lobby "makes statements" to Tawfik "about another unidentified prostitute [who] has HIV and is not telling [her] . . . clients about it."  Defs. Objs. at 7 (referencing CH01-Item 237).  In response, Tawfik states that she had another woman ("Black Mo") beat the prostitute as punishment.  See CH01-Item 237.  Defendants suggest that the mention of the prostitute's HIV is irrelevant.  Defs. Objs. at 7.  Alone, the fact that the prostitute has HIV might be inconsequential.  But the mention of the prostitute's HIV was not made in isolation; rather, the mention was made in the context of a broader conversation.  This broader conversation reflects that Tawfik knew about the prostitute's commercial sex activities at the Victory Inn and that Tawfik commanded Black Mo to beat the prostitute for having sex with clients without telling them about her HIV

12

status.  Thus, the Government is correct that "[t]aken in conjunction with witness testimony and other videos, this video tends to make the existence of a fact of consequence [more likely], to wit: that [Tawfik] was aware of and controlling the sex trafficking at the hotel including the use of threats, force, and coercion . . . ."  Gov't Summary of Camera 1 at PageID.3905.

Third, Defendants challenge the relevancy of Tawfik and Randol's videoed conversation about individuals who are referred to as "Alicia, Charles, and Jose."  Defs. Objs. at 12 (referencing CH01-Item 518).[2]  Specifically, Defendants contend that "statements about Alicia, Charles, and Jose are irrelevant."  Id.  The Court disagrees.  In this conversation, Tawfik complains to Randol that the three individuals were "working outta Charles' car in the back parking lot."  See CH01-Item 518.  Randol tells Tawfik this is a "damn lie," but Tawfik shakes her head and remains displeased.  See id.  Randol then hands money to Tawfik, which she counts.  See id.  Tawfik asks if the money is for rooms 201 and 215; Randol says, "and 220."  See id.  Tawfik then gives keys to Randol.  See id.  The Government contends that the video—including the statements about Alicia, Charles, and Jose—are relevant to show that Tawfik "exerted control over the Victory Inn, including who could be there, to ensure that continued productivity of both the drug and sex trafficking conspiracies."  Gov't Summary of Camera 1 at PageID.3917.  Tawfik's complaint to Randol—who the Government intends to prove was an "enforcer for the members of the drug and sex trafficking conspiracies," see, e.g., id. at PageID.3906—about three individuals being at the Victory Inn makes it at least slightly more likely that Tawfik "exerted control over the Victory Inn, including who could be there."  Additionally, the video, taken in conjunction with testimony that the Government intends to present at trial that "will establish that members of the sex trafficking conspiracy purchased multiple rooms to facilitate more commercial sex acts," see id. at

---

[2] It is not clear from the parties' briefing who, exactly, Alicia, Charles, and Jose are.

PageID.3917, makes it more likely that Randol and Tawfik were involved in the sex trafficking conspiracy.

Fourth, Defendants argue that a video showing Nero rolling a suitcase at the Victory Inn is irrelevant because "the presence of a suitcase is extremely common."  Defs. Objs. at 19 (referencing CH05-2016-12-22-232).  This is not an accurate description of the video.  The video shows Nero rolling a suitcase in a hallway and approaching room 203.  See CH05-2016-12-22-232.  Daugherty walks out of room 203, and then speaks to Tawfik, who is also in the hallway. See id.  Daugherty and Tawfik then walk towards Nero, Daugherty takes the suitcase from Nero, Daugherty goes back into room 203, Nero enters room 203, and Tawfik remains in the hallway. See id.  As the Government argues, this video makes it at least slightly more probable that "(1) [t]here is an association between Daugherty, Nero, and Tawfik, all of whom have been identified as members of the sex and drug trafficking conspiracies; and (2) Daugherty lives in and controls room 203[.]"  Gov't Summary of Camera 5 at PageID.3929.

Fifth, Defendants challenge the relevancy of a video that "shows Randol wearing a pair of ripped jeans."  Defs. Objs. at 24 (referencing CH05-2017-01-07-480).  Specifically, Defendants argue that "[t]his clip is not relevant to the case unless the Government can explain why what Mr. Randol was wearing is relevant."  The Government has explained that Randol's distinct pants are relevant for the purposes of identifying him.  The video shows a man standing outside Room 203 before going in; his face, however, is not clearly viewable.  See CH05-2017-01-07-480.  As the Government contends, the man is likely Randol because he is "wearing a pair of jeans that are ripped, [which Randol wore] . . . in other videos where the camera clearly recorded his face."  Gov't Summary of Camera 5 at PageID.3937.  The video in its entirety is relevant because "[t]aken in conjunction with witness testimony and other videos, this video tends to make the existence of

14

a fact of consequence [more likely], to wit: there is an association between coconspirator Bryant Daugherty," who allegedly controlled room 203, "and Randol, both identified as members of the sex and drug trafficking conspiracies . . . ." <u>Id.</u>

For the foregoing reasons, the Court declines to exclude the proffered video evidence on relevancy grounds.

### ii. Speculation

Defendants object to several videos on speculation grounds, without stating the exact legal basis for these objections.  The Government assumes—and this Court will as well—that Defendants' objections are based in the general notion that the factfinder cannot "reach conclusions based on 'speculative inferences.'"  Gov't Reply at 14 (quoting <u>United States v. Catching</u>, 786 F. App'x 535, 539 (6th Cir. 2019)).  Conversely, a factfinder can "make reasonable inferences from the evidence provided in reaching its conclusions."  <u>Catching</u>, 786 F. App'x at 539 (punctuation modified).  An inference is "a reasonable deduction and conclusion from proven facts."  <u>Id.</u> (punctuation modified, citation omitted).  The Court discusses in turn speculation objections to videos depicting conspiracy members and videos depicting non-conspiracy members.

### a. Conspiracy Members

Defendants object to several videos containing statements of conspiracy members that, according to Defendants, invite the jury to improperly speculate as to unproven facts.  For instance, Defendants object to a video showing Tawfik and Randol speaking in the lobby.  <u>See</u> Defs. Objs. at 10 (referencing CH01-Item 393).  Tawfik asks Randol if they "need anything for tomorrow?" <u>See</u> CH01-Item 393.  The Government contends that "[e]vidence at trial will establish [Tawfik] was asking if Randol needed more drugs."  Gov't Summary of Camera 1 at PageID.3915.  Randol answers, "fa show," and Tawfik then suggests that she and "Tone" (Bell) will "come on the side .

. . around 6:30 in the morning." <u>See</u> CH01-Item 393.  Tawfik tells Randol that the "last time" she

and Bell had to give "it" to "Honey." <u>See</u> <u>id.</u>  Randol and Tawfik then discuss Honey, <u>see</u> <u>id.</u>,

whom the Government claims is a "known prostitute in the employ of Bell," Gov't Summary of

Camera 1 at PageID.3915.  Randol and Tawfik discuss how Honey is missing. <u>See</u> CH01-Item

393.  During this conversation, Randol hands Tawfik a large sum of cash; she counts the cash and

says that Randol owes "six more." <u>See</u> <u>id.</u>  At the end of the conversation, Tawfik, referring to

Honey, says "[s]he don't have to be cookin and cuttin shit," and Randol responds: "Most definitely,

she getting fucked up." <u>See</u> <u>id.</u>

Defendants argue that by offering this video into evidence, the Government asks the jury

to speculate that (i) Honey is a prostitute who was in the employ of Bell, and (ii) Tawfik was

referencing drugs when she asked Randol if he would "need anything tomorrow" and when she

said that she had to give "it" to Honey "last time."  Defs. Objs. at 10.  The Court disagrees.  It

appears that the Government intends to introduce testimony at trial that Honey was a prostitute

employed by Bell. <u>See</u> Gov't Summary of Camera 1 at PageID.3911.  Further, the Government

states that it will establish through other evidence that Tawfik was talking to Randol about drugs.

<u>Id.</u> at PageID.3915.  Even absent evidence directly showing that Tawfik and Randol were talking

about drugs, the Government would not be asking the jury to make unreasonable inferences.

Because the Government says it will introduce other evidence showing that Tawfik and Randol

were members of the drug conspiracy, <u>see</u> <u>id.</u>, the Government will ask the jury only to "make

reasonable inferences" that Tawfik and Randol were discussing drugs in this instance, based on

"the [other] evidence . . . ." <u>Catching</u>, 786 F. App'x at 539 (punctuation modified).

The Government asserts it will supply evidence upon which the jury could rely to infer that

similar videos depicting discussions between conspiracy members concerned the drug or sex

trafficking conspiracies.  If the Government does so, these videos will not be excluded on speculation grounds.

### b.  Non-Conspiracy Members

Defendants contend that videos depicting individuals who are "not known" are speculative because "the Government intends somehow to show the intent of what these people were doing." Defs. Objs. at 5.  Defendants contend that "without having these [unknown] individuals testify or somebody with intime [sic] knowledge of a particular video clip [testify]," it is pure speculation as to what these unknown individuals were intending to do.  Id.  Defendants also assert that Government agents lack the requisite firsthand knowledge to testify as to what these unknown individuals were intending to do.  See, e.g., id. at 9.

As a "prime example," Defendants point to the videos that depict individuals under the influence in proximity to rooms that were allegedly used by conspiracy members for drug trafficking.  Id. at 5.  Defendants argue that, without testimony from the allegedly intoxicated individuals, it is speculative to conclude why these individuals were at the Victory Inn, that they were intoxicated, and that they were under the influence of drugs (rather than, for instance, alcohol).  Id. at 5–6.

The Government intends to use these videos "in conjunction with witness testimony and other videos" to show that certain Victory Inn rooms were used for dealing drugs.  See, e.g., Gov't Summary of Camera 5 at PageID.3935.  Because the Government intends to produce other evidence showing that the rooms were used for drug trafficking, the Government contends that drawing the conclusion that intoxicated people went to these rooms to buy drugs is "not speculation, but a reasonable inference based on the facts proven from the videos."  Gov't Reply at 15.  The Court agrees.

17

Assuming that the Government provides proper corroborating evidence for the videos depicting unidentified individuals, the Government will ask the jury only to "make reasonable inferences from the evidence provided in [the videos depicting unidentified individuals]." Catching, 786 F. App'x at 539 (punctuation modified).  The Court declines to presently exclude the videos depicting unknown individuals on speculation grounds.

### iii. Prejudice

A district court may exclude evidence, even if it is relevant, when that evidence's "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  District courts are accorded "wide discretion" in determining the admissibility of evidence under Rule 403.  United States v. Whyte, 795 F. App'x 353, 361 (6th Cir. 2019).

Unfair prejudice "does not mean the damage to a defendant's case that results from the legitimate probative force of evidence."  United States v. Gibbs, 182 F.3d 408, 430 (6th Cir. 1999) (punctuation modified). "[R]ather, it refers to evidence which tends to suggest decision on an improper basis."  Id. (punctuation modified).  For instance, evidence that "serves to inflame the passions of the jury" is unfairly prejudicial.  Sutkiewicz v. Monroe Cnty. Sheriff, 110 F.3d 352, 360 (6th Cir. 1997).

The videos to which the Defendants object on unfair prejudice grounds largely overlap with the videos that Defendants object to on relevancy grounds.  As discussed above, these videos depict, among other things, individuals entering and exiting Daugherty's and Avery's rooms, conspiracy members with large amounts of cash, hand-to-hand exchanges, intoxicated individuals, firearms, Nero striking women, and unknown individuals.  As illustrated by the above analysis,

18

these videos are relevant to show, among other things, the existence of an underlying agreement and conspiracy between Defendants and their coconspirators to traffic drugs at the Victory Inn and that drug trafficking occurred at the Victory Inn. "[W]hen the government is attempting to prove that a defendant was part of a criminal conspiracy to distribute drugs, it is generally not unfairly prejudicial for the jury to see proof that the defendant and/or their co-conspirators associated themselves with cash, guns, and drugs." Whyte, 795 F. App'x at 361 (punctuation modified). This is precisely what much of the video evidence portrays.

Even the videos that do not directly portray cash, guns, or drugs are a step on the evidentiary route to proving drug trafficking. For instance, certain videos depict individuals visiting rooms (that the conspiracy members allegedly used for drug trafficking) for a short period of time. The Government intends to elicit testimony to show that "short stays" like the ones portrayed in the videos are indicative of drug trafficking. Gov't Reply at 19. Likewise, certain videos depict intoxicated individuals in the proximity of Daugherty's and Avery's rooms. The Government intends to elicit testimony from drug users portrayed in the videos to show that people under the influence hung out around these rooms because this is "where the lion's share of the drugs were distributed." Id. at 12. Based on other testimony and evidence, the jury can draw a reasonable inference from these videos that drugs were sold from Daugherty's and Avery's rooms. See Catching, 786 F. App'x at 539. Such videos are certainly damaging to Defendants' case, but they would not prompt the jury to find Defendants guilty on an improper basis, such as inflamed passions. As a result, these videos are not unfairly prejudicial. See Gibbs, 182 F.3d at 430; Sutkiewicz, 110 F.3d at 360.

### iv. Hearsay

Hearsay is any statement that (i) a declarant "does not make while testifying at the current trial" and (ii) is offered into evidence "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).  Certain statements are excluded from the definition of hearsay, such as statements offered against an opposing party that were "made by the party's coconspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  If a statement meets the definition of hearsay, it is generally inadmissible.  See Fed. R. Evid. 802.  However, the statement will be admissible if it satisfies one or more of the hearsay exceptions.  See Fed. R. Evid. 803, 804, 807.

Defendants contend that many of the camera one videos should be excluded as inadmissible hearsay.  The parties have more fully briefed hearsay concerns with the camera one videos in their briefing regarding the Government's coconspirator statements offer of proof and motion in limine to admit statements (Dkt. 730).  Accordingly, hearsay concerns regarding the camera one videos will be addressed in the Court's separate opinion on the Government's coconspirator statements offer and motion in limine.

In addition to their hearsay objections to the camera one videos, Defendants raise a hearsay objection related to CH10-Item 72.  This video shows three men standing outside Room 217 on December 29, 2016 around 2:43 a.m.  See CH10-Item 72.  One of the men appears to count cash, and then hands cash or some other object to someone inside Room 217.  See id.  That man and one other then enter the room, while the third man waits outside.  See id.  The Government contends: "Given that the third man waits outside while the other men in his group go inside, it is unlikely that their interaction was social.  The video strongly suggests they engaged in a drug transaction." Gov't Summary of Camera 10 at PageID.3985 (Dkt. 684-7).  The Government indicates that it will

20

offer into evidence a receipt showing that Room 217 was registered to Nero from December 28–29, 2016.  See id.  Defendants contend that "[w]ithout proper foundation, the room receipt is hearsay."  Defs. Objs. at 62.  The receipt could fall into the business records exception to hearsay if the Government can show that the receipt was a record normally kept in the operation of the Victory Inn and was supported by the testimony of a custodian of the business's records.  See United States v. Copeland, 51 F.3d 611, 616 (6th Cir. 1995) (citing Fed. R. Evid. 803(6)).  If the Government is able to make the proper showing, the receipt will not be excluded as hearsay.

### v.  The Confrontation Clause

Defendants argue that the admission of several camera one videos containing statements by unidentified individuals would violate the Confrontation Clause.  See, e.g., Defs. Objs. 8 (referencing CH01-Item 261, CH01-Item 294).  Defendants' argument is that the Government will not call these unidentified individuals to testify, and, as a result, Defendants will not be able to confront these individuals about their statements.  See id. at 6.

The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  Witnesses are "those who bear testimony."  Crawford v. Washington, 541 U.S. 36, 68 (2004) (punctuation modified).  The Confrontation Clause, therefore, is triggered by "testimonial" statements—i.e., statements that "a reasonable person in the declarant's position would anticipate . . .  being used against the accused in investigating and prosecuting the crime."  United States v. Martinez, 430 F.3d 317, 329 (6th Cir. 2005) (punctuation modified, citation omitted).  Non-testimonial statements do not implicate the Confrontation Clause and are subject only to the traditional limitations on hearsay evidence.  Id.

The camera one video captures conversations between individuals who did not—at the time that the conversations occurred—know that the surveillance footage would one day be used in a criminal investigation.  Thus, the declarants would not have reasonably anticipated their statements being used in the investigation or prosecution of a crime.  Therefore, admission of these videos does not violate the Confrontation Clause.

Defendants also challenge a video from one additional camera: CH08-Item 211.  This video shows several individuals exiting room 214 with Avery.  See CH08-Item 211.  The Government contends that "[t]he female closest to Avery is in a constant irregular motion, one of the characteristics of being under the influence."  Gov't Summary of Camera 8 at PageID.3957.  Defendants argue: "Showing video of an unknown person's conduct as assertions to establish the government's conclusions, without any evidence that he is linked to Defendants other than Avery, violates Defendants' right to confrontation."  Defs. Objs. at 35.

Nonverbal conduct constitutes a statement "if the person intended it as an assertion."  See Fed. R. Evid. 801(a).  "If the person is merely doing something, however, the nonverbal conduct is not assertive," and "there is no statement to "confront."  Givhan v. Richardson, No. 16-C-315, 2020 WL 2527357, at *2 (E.D. Wis. May 18, 2020).  CH08-Item 211 merely depicts a woman doing something rather than asserting something.  Absent a statement by this woman, there is no Confrontation Clause concern.

Accordingly, Defendants' objections based on the Confrontation Clause are overruled.

### vi.  Authentication, Foundation, and Lay Witness Testimony

Defendants object to numerous videos on the grounds that the Government cannot supply the necessary authentication or foundation (other than through impermissible lay witness testimony) for these videos.  Specifically, Defendants argue that the Government cannot

authenticate the videos depicting unidentified individuals because these individuals will not testify at trial.  See Defs. Objs. at 2 (citing Fed. R. Evid. 901(b)(1)).  Without testimony of the individuals depicted in the videos, Defendants argue, the Government cannot lay a proper foundation as to what the individuals intended.  See id. at 6.  Further, Defendants state, Government agents cannot supply the necessary explanation, as these agents were not personally present during the incidents depicted in the videos.  See id.

Rule 901 sets forth the requirement for authenticating evidence: "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).  Rule 901(b) sets forth a non-exhaustive list that satisfies the requirement, including testimony from a witness "with knowledge" that the item "is what it is claimed to be." Fed. R. Evid. 901(b)(1).  In the case of surveillance videos, authentication can be achieved through testimony of a witness who has familiarity with business surveillance videos, has personal knowledge of the events depicted in the videos, and can confirm that the videos accurately portray the events and the business premises.  See, e.g., United States v. Wells, 827 F. App'x 664, 667 (9th Cir. 2020).

This implicates the personal knowledge requirement of Rule 602.  Pursuant to Rule 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may consist of the witness's own testimony."  The threshold for establishing that a witness meets Rule 602's requirements of personal knowledge is low.  See United States v. Hickey, 917 F.2d 901, 904 (6th Cir. 1990).  "Testimony should not be excluded for lack of personal knowledge

unless no reasonable juror could believe that the witness had the ability and opportunity to perceive the event that he testifies about."  Id.[3]

The requirement that a witness perceive the events about which the witness testifies also derives from Rule 701.  Pursuant to Rule 701, "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."[4]

Here, there can be little dispute that witnesses depicted in the videos possess the requisite personal knowledge and rational perception to testify about the events depicted in the videos.  However, Defendants fear that the Government will utilize Government agents—who viewed the videos but are not depicted in them—to explain the videos' contents.  As this Court has previously recognized, agents involved in the criminal investigation can easily satisfy the personal knowledge requirement:

---

[3] It bears noting that "surveillance videos are not witness testimony that requires personal knowledge."  Feiman v. City of Santa Monica, No. CV 12-3549-JGB JCX, 2013 WL 5539389, at *4 (C.D. Cal. Oct. 3, 2013).  It is possible that the Government may offer into evidence certain videos without accompanying witness testimony about the videos.  For such videos, Rule 602's personal knowledge requirement will be inapposite.  However, Defendants fear that certain videos are irrelevant, speculative, or unfairly prejudicial absent an explanation from an accompanying witness.  The analysis below sets forth the boundaries for lay witness testimony.

[4] As this Court has previously recognized, "[w]ith respect to testimony interpreting recorded events, '[c]ourts often qualify law enforcement officers as expert witnesses under Rule 702 to interpret intercepted conversations that use slang, street language, and the jargon of the illegal drug trade.'"  4/29/21 Op. at 6 (Dkt. 610) (quoting United States v. Kilpatrick, 798 F.3d 365, 379 (6th Cir. 2015)).  Only when an officer is not qualified as an expert do the rules governing lay witness testimony come into play.  See id.  "[W]hen an officer is not qualified as an expert, lay opinion is admissible 'only when the law enforcement officer is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred.'"  Id. (quoting Kilpatrick, 798 F.2d at 379).

24

> For example, the Sixth Circuit held that a district court properly permitted agents
> to testify regarding their interpretations of text messages where they took active
> roles in the years-long investigation by interviewing witnesses, reviewing relevant
> documents and thousands of text messages, and listening to recorded phone calls.
> [Kilpatrick, 798 F.3d] at 381.   Likewise, the Sixth Circuit upheld a decision
> permitting an agent to identify suspects' voices and interpret ambiguous phrases in
> recorded phone calls where that agent had personally listened to intercepted phone
> calls, watched surveillance videos, and interacted with witnesses and informants.
> United States v. Williamson, 656 F. App'x 175, 187 (6th Cir. 2016).

See 4/29/21 Op. at 7.

Further, where an investigating officer "viewed the surveillance video with his own eyes,"

his testimony "about what the video showed would plainly have a rational basis in his own

perception, so as to satisfy Rule 701(a)."  Kirksey v. Schindler Elevator Corp., No. 15-0115-WS-

N, 2016 WL 5239874, at *8 (S.D. Ala. Sept. 21, 2016).

However, the testimony that an investigating officer may give regarding the surveillance

video must be within the proper confines of lay witness testimony.  "[T]he distinction between lay

and expert witness testimony is that lay testimony results from a process of reasoning familiar in

everyday life, while expert testimony results from a process of reasoning which can be mastered

only by specialists in the field."  United States v. Ebron, 683 F.3d 105, 136–137 (5th Cir. 2012)

(punctuation modified).  In other words, "a lay opinion must be the product of reasoning processes

familiar to the average person in everyday life."  United States v. Garcia, 413 F.3d 201, 215 (2d

Cir. 2005).  Courts have drawn a line between investigating officers' (i) permissible descriptions

of individuals and events depicted in videos—such as "'the appearance of persons or things,

identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size,

weight, [and] distance,'" Mayfield v. Brewer, No. 2:13-cv-73-KS-MTP, 2014 WL 5467011, at *4

(S.D. Miss. Oct. 28, 2014) (quoting Fed. R. Evid. 701 advisory committee's note)—and (ii)

impermissible opinions about the off-screen cause of events depicted in a video, see Ronaldo

25

Designer Jewelry, Inc. v. Cox, 1:17-CV-2-DMB-DAS, 2020 WL 1076047, at *7 (N.D. Miss. Mar. 6, 2020), or about the mental intent of words or actions of individuals depicted in the video, see Ebron, 683 F.3d at 137 (holding that an law enforcement specialist's identification of individuals captured in surveillance video was permissible lay witness testimony, but the specialist's opinion about the intent of an individual's hand gesture in the video was impermissible).

Additionally, even if an agent's lay opinion is based on the agent's personal knowledge and perception—and does not cross into the territory of expert testimony—the testimony still must be helpful to the jury in order to be admissible under Rule 701(b).  As this Court has previously explained:

> In general, lay opinion testimony is helpful within the meaning of Rule 701(b) when the witness has "enjoyed significantly more time to study and compare the evidence" than the jury.  United States v. Shields, 480 F. App'x 381, 387 (6th Cir. 2012) (approving admission of an officer's lay opinion regarding similarities between the tread on the defendant's shoes and a photograph of shoe prints at the crime scene). By contrast, lay opinion testimony is not helpful "when a witness . . . forms conclusions for a jury that the jurors are competent to reach on their own." Kilpatrick, 798 F.3d at 380. Thus, for example, an officer "may not explain to a jury what inferences to draw from recorded conversations involving ordinary language," which would be readily understandable to a juror.  [United States v. Freeman, 730 F.3d 590, 598 (6th Cir. 2013)].  Nor may an officer "merely tell the jury what result to reach" or "effectively spoon-fe[ed] his interpretations of the phone calls and the government's theory of the case to the jury . . . ." Id.  Lay opinion witnesses must also avoid expressing a conclusion regarding a defendant's guilt.  Kilpatrick, 798 F.3d at 381.

4/29/21 Op. at 7–8.

The Court has not been informed of the witnesses that the Government will call to interpret the video evidence.  Accordingly, the Court is unable to presently assess the witnesses' personal familiarity with the videos.  In the absence of such context, the Court cannot make a blanket determination as to the admissibility of the witnesses' testimony concerning the interpretation of the videos.  The admissibility of such testimony will depend on the Government laying a proper

26

foundation, as it claims it will do, see Gov't Reply at 17, and eliciting only lay witness testimony that complies with the rules set forth above.

### vii.  Completeness

Pursuant to Rule 106, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."  "The rule is based on two considerations": (i) "the misleading impression created by taking matters out of context" and (ii) "the inadequacy of repair work when delayed to a point later in the trial."  Fed. R. Evid. 106 advisory committee's note.  Exculpatory hearsay cannot be admitted "solely on the basis of completeness"; such statements may come in only if they satisfy one of the hearsay exclusions or exceptions.  United States v. Adams, 722 F.3d 788, 826 (6th Cir. 2013).

Defendants raise a Rule 106 objection to CH01-Item 214.  See Defs. Objs. at 7.  In this video, an unidentified woman walks into the lobby and tells Tawfik that a man in the woman's room  stole her "dope," won't leave, and has been beating her for four days.  See CH-01 Item 214. Tawfik instructs the woman to tell the man that she is going to call "Tone" (Bell) about the situation.  See id.  The woman states that the man told her that if she calls Tone, it will be "the worst mistake of her life."  See id.  Tawfik then tells the woman to "knock on 'B's door" and that he will "take care of it."  See id.  The Government contends that the man who will "take care of it" is Bryant Daugherty.

The segment of the conversation between Tawfik and the woman that the Government seeks to play at trial is approximately two minutes in length.  Defendants argue that the entire conversation actually lasts for 24 minutes, and that other parts of the conversation "put[] who is hurting the woman into context and goes directly against the Government's arguments that this

individuals' experience had any involvement with the alleged conspiracy." Defs. Objs. at 7. Because the Court has not been provided with the additional parts of the video that Defendants want to play, the Court ordered Defendants to provide the Court with copies of the additional parts of the video that they may seek to use at trial. 3/28/22 Order (Dkt. 769). Defendants were required to provide these copies to the Court by March 29, 2022. Id. However, Defendants failed to provide copies by this date. Nor have Defendants indicated—by, for instance, a motion for an extension— that the copies are forthcoming. As a result, the Court cannot presently evaluate whether any additional part of the video may be admissible.

Accordingly, Defendants' Rule 106 objection to CH01-Item 214 is overruled.

### B. The Assault Videos

The Government summarizes the 14 videos referred to as the assault videos as follows:

> On December 12, 2016, . . . Avery, was assaulted and possibly robbed at the Victory Inn. Immediately after the assault, Avery, . . . Nero, and . . . Randol, associated a man, wearing a Detroit Tiger's coat, with the robbery and assault. They found the man, who was still at the Victory Inn, and viciously assaulted him, rendering him unconscious. Nero and Randol then move the victim's limp body into an interior hallway to hide it from the outside. Nero later moves the body a second time when . . . Tawfik[] advises him that the insensible body was visible on the camera in the interior hallway. Soon after, Nero returns with coconspirator . . . Daugherty to move the body a third time. This time, Nero lifts the victim, punches the man in the face, drags him through the Victory Inn, puts him in a car, and drives away.

Gov't Resp. at 9–10. Upon learning that the assault had occurred, Tawfik made a phone call (to Bell, the Government argues). Gov't Reply at 23. Tawfik realized that the assault was caught on camera, and she and Randol attempted to delete the recording. Id. The Government asserts that the videos are primarily relevant to show the existence of a conspiracy. Id. at 22.

Defendants "object to the assault videos being shown for the purpose of establishing sex trafficking and drug distribution conspiracies." Defs. Objs. at 65. Defendants contend that the Government cannot prove that the coconspirators committed the assault to further the means of

the conspiracies because, among other reasons, there is no evidence that drugs or drug proceeds were taken from Avery when he was assaulted.  Id. at 65–66.  Defendants conclude that "there is no foundation establishing a common purpose and objective" for the assault, and, therefore, to suggest otherwise is "pure speculation and conjecture."  Id. at 66.  Defendants argue that because the assault videos are speculative, they are irrelevant and unfairly prejudicial.  Id.  Additionally, Defendants argue that the assault videos "amount[] to other acts evidence" under Rule 404(b).  Id.  The Court addresses Defendants' objections based on speculation, irrelevance, and unfair prejudice before turning to Defendants' objections based on Rule 404(b).

### i. Speculation, Relevance, and Unfair Prejudice

The Eighth Circuit's analysis in United States v. Noe, 411 F.3d 878 (8th Cir. 2005) provides useful guidance in this case.  In Noe, the government sought to introduce evidence that the defendant assaulted an individual who took drugs without paying for them, breaking two of the individual's teeth and removing another tooth with pliers.  Id. at 887.  The defendant moved to exclude the evidence of the assault on the ground that it was irrelevant to the drug conspiracy charges pending against him.  Id.  He also argued that the evidence was inflammatory and, therefore, unfairly prejudicial.  Rejecting the defendant's irrelevancy argument, the court observed that "[e]vidence of violent acts committed by conspirators during and in relation to the conspiracy are direct evidence of the conspiracy" and, therefore, admissible.  Id. (punctuation modified).  The court also rejected the defendant's argument that the evidence was unfairly prejudicial, explaining:

> [The defendant's] use of violence underscored to [the victim] and others in the conspiracy the seriousness of the business and the consequences of disloyalty.  It was highly probative of the conspiracy itself and [the defendant's] leadership role within it.  Although doubtless graphic, the pliers incident evidence was not so inflammatory as to mandate a finding that it was so unfair and had such a tendency to support a decision on an improper basis that the district court abused its discretion in admitting it.

Id.

Defendants suggest that it is speculative that the assaults in this case were committed in relation to the drug conspiracy because the assault videos do not directly show drugs or drug proceeds being stolen from Avery.  The assault videos clearly show that Avery's attacker takes something after it falls from Avery's person.  See CH09-2016-12-16-18-33-15_1.  One reasonable inference is that the items that fell from Avery's person—which were immediately taken by the attacker—were drugs or drug proceeds.  This is what the Government argues.  See Gov't Summary of Assault Videos at PageID.4034 (Dkt. 684-10) (stating that when "Avery drops to the ground," the attacker "grabs several items off the floor, possibly narcotics and/or money").  It is also possible that the items were not drugs or drug proceeds.

Ultimately, the fact that the identification of the items is open to more than one reasonable interpretation does not render the assault videos irrelevant.  Regardless of what fell from Avery's person, the videos show that the coconspirators used violence during the alleged conspiracy, "underscore[ing] to [the victim] and others . . . the seriousness of the business and the consequences of [hurting one of its members]." Noe, 411 F.3d 887.  Thus, the videos are "probative of the conspiracy itself." Id.

Further, although the videos depicting the coconspirators' assault are graphic (like the evidence of the violence in Noe), the videos are "not so inflammatory as to mandate a finding that it was so unfair and had such a tendency to support a decision on an improper basis." Id.  Because the videos are very probative of the existence of the conspiracy itself, the probative values of the videos are not outweighed by unfair prejudice to Defendants.  See id.

Accordingly, the Court will not exclude the assault videos on grounds of speculation, irrelevance, or unfair prejudice.

### ii. Rule 404(b)[5]

"Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).  However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).

Defendants argue in a conclusory manner that the assault videos "amount[] to other acts evidence and should be excluded for that reason."  Defs. Objs. at 66.  However, as the Government states, the assault "the incident is not 404(b) evidence, as it occurred during the timeframe of the two conspiracies as charged in the Second Superseding Indictment and is directly connected to the coconspirators."  Gov't Reply at 24.  Indeed, as demonstrated by the analysis above, the videos depict an assault committed by coconspirators during the conspiracy and in furtherance of the conspiracy.  The videos are, therefore, offered to prove the existence of a conspiracy, not for an impermissible purpose under Rule 404(b).  Thus, Defendants' Rule 404(b) objections are overruled.

### C.  Transcripts

Defendants initially objected to the use of the transcripts of the conversations captured by camera one.  Defs. Objs. at 66–69.  However, the parties subsequently "met and agreed to the vast majority of transcripts," leaving only "6 words in dispute."  Gov't Tr. Br. at 20 (Dkt. 759).  The Court ordered the parties to "email the Court's case manager regarding their respective positions

---

[5] This opinion addresses Defendants' Rule 404(b) objections to the Government's proposed video evidence.  The Court will address by a separate opinion the Government's motion in limine to admit evidence pursuant to Rule 404(b) (Dkt. 724), which does not concern the proposed video evidence.

on the six words in dispute from the transcripts for the Victory Inn surveillance footage of camera one." 3/16/22 Order at 1 (Dkt. 760).  The parties did so, and the Court informed the parties of its view of these disputed words.  Accordingly, Defendants' objections to the transcripts are moot.

## II.  CONCLUSION

For the foregoing reasons, the Court overrules certain of Defendants' objections and defers ruling on others.

SO ORDERED.

Dated:  March 31, 2022                                    s/Mark A. Goldsmith
       Detroit, Michigan                              MARK A. GOLDSMITH
                                 United States District Judge