UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,              CASE NO. 17-cr-20183

v.                                 HON. MARK A. GOLDSMITH

D-1, DARRICK BELL,

               Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

The evidence at trial established one unassailable conclusion: Darrick Bell was the leader of the drug and sex trafficking conspiracies at the Victory Inn. Witnesses from inside the Victory Inn testified that Bell supplied the drugs, facilitated the prostitution, and took the money. The witnesses characterized Bell as both a "pimp" and a "drug dealer." Their testimony, identifying Bell as the man in charge, was resolute.

Bell turned the Victory Inn into a hotel of horrors. One coconspirator described the Victory Inn, "like something I've never seen before. [I]t's a lot of people on drugs . . . dope sick . . . walking around in the hallways actually shooting up . . . . A lot of prostitutes." (ECF No. 917, PageID.8026). The Victory Inn was "known for drugs and prostitution and money making . . . ." (ECF No. 922, PageID.8789). The police found it was common "to have [a] police run based on

[a] drug overdose . . . people fighting . . . . [S]eeing how un-hygiene [sic] it was, it kind of was mind-boggling." (ECF No. 911, PageID.7129). As described by one police officer, the drug users were rampant and looked like "zombies." (ECF No. 911, PageID.7120). When Bell's coconspirators used violence to collect a drug debt, a witness saw "marks on women's bodies," "fat busted lips . . . . [B]ruises on arms. [B]ruises on [an] eye socket . . . ." (ECF No. 916, PageID.7849-7850).

No one had it worse than the women inside the Victory Inn. These women were trapped in a vicious cycle of addiction. They used drugs, engaged in commercial sex acts, then used the money from their dates to purchase more drugs. One woman testified she did dates and "engaged in seven full days of smoking crack and doing heroin" without sleep. (ECF No. 914, PageID.7523). Bell knew the women were hopelessly addicted to the drugs he supplied and only cared about "[d]rugs and getting more drugs." (ECF No. 914, PageID.7523). The women, helplessly shackled to the Victory Inn with few alternatives, suffered from their drug debts, drug dependance, and privation.

Recognizing an easy way to make large amounts of money, Bell created a large scale full service operation for drugs and prostitution. Using these women enslaved by crack and heroin as a lure, the Victory Inn made drugs, rooms, and prostitution readily accessible to anyone off the street. Simply put, Bell made considerable money off the backs of those that suffered the most.

Bell's business plan was equal parts brilliant and sinister; put drugs, drug dealers, johns, and prostitutes in a motel next to the main drag for prostitution, Michigan Avenue. He utilized the motel clerks to gain control of the rooms and moved his coconspirators onto the premises. Bell, to minimize the risk to himself, employed drug dealers and enforcers to use manipulation, drugs, and violence to control the Victory Inn, his human trafficking conspiracy, and his drug conspiracy.

Bell, who was shrewd, callous, and highly intelligent, went on the run and avoided capture and responsibility for years. Now, Bell stands before this Court to face the consequences of his actions. Justice demands a 35-year sentence.

## I.     Statement of Facts

### A.     "Darrick Bell, that main guy. He's the main guy."

Testimony at trial established that, at the Victory Inn, Bell was in charge of the drugs and prostitution. A.P. testified that "Darrick Bell, that main guy. He's the main guy. He's the supplier for the Victory Inn." (ECF No. 916, PageID.7832). B.D. testified that Bell was in charge of the prostitution and "was the one passing out the drugs."(ECF No. 922, PageID.8785). S.N. testified that Bell "was basically running the Victory Inn." (ECF No. 914, PageID.7555). S.V. said that Avery, the biggest drug dealer at the Victory Inn, worked for Bell." (ECF No. 921, PageID.8689). K.G. told HSI that "[e]veryone talked to [Bell] as if he was in charge and with much respect." (HSI ROI 077, Aug. 24, 2017, 3.) B.D. steadfastly

3

told the jury that Bell "was supplying the Victory Inn, period . . . ." (ECF No. 922, PageID.8812). J.G. identified Bell as "the boss" and that Avery and B.D. were two members of the crew who worked for him. (ECF No. 918, PageID.8151). J.G. referred to Avery as Bell's "right-hand man." (ECF No. 918, PageID.8235). When Avery received a call from Bell while A.P. was present, Avery answered, "what's up boss?" (ECF No. 917, PageID.8070). According to S.N., everything at the Victory Inn "revolved around" Bell. (ECF No. 914, PageID.7555).

At the Victory Inn, Bell primarily went by the names Tone or Ghost. One time, R.A. asked Bell why he introduced himself by a fake name. (ECF No. 970, PageID.10519). Bell responded, "it was to conceal his identity because he did a lot of illegal things." (ECF No. 970, PageID.10519).

B.     Bell "was supplying the Victory Inn period . . . ."

B.D., J.G., A.R., R.A., and A.P., all testified that Bell sold drugs at the Victory Inn or elsewhere. B.D. testified that Bell recruited him to sell drugs at the Victory Inn. (ECF No. 922, PageID.8785). Bell took B.D. to the Victory Inn where he saw "prostitution, drug selling, [and] drug using." (ECF No. 922, PageID.8785). When Bell first brought B.D. to the Victory Inn to work, Bell introduced him to Avery. (ECF No. 922, PageID.8787). Bell, like J.G., described Avery as "his right-hand man." (ECF No. 922, PageID.8787). Later Bell and J.G. put B.D. in a room "for the purpose of selling crack." (ECF No. 922, PageID.8788). Bell gave him the

crack and B.D. "just sat in the room and they [drug users] came to the door." (ECF No. 922, PageID.8789). Almost immediately, he had fifteen to twenty customers "to purchase crack cocaine." (ECF No. 922, PageID.8789). B.D. explained that the Victory Inn was "known for drugs and prostitution and money making . . . ." (ECF No. 922, PageID.8789). Simply put, B.D., a street-level drug dealer, had "never seen traffic and that many people come as quick as they came to purchase the crack cocaine." (ECF No. 922, PageID.8791).

Later, Bell drove B.D. to the Victory Inn a second time. Once there, Bell introduced B.D. to Nero and Randol. (ECF No. 922, PageID.8795). Bell also introduced B.D. to "[t]he women who was working out of the motel, prostituting they self [sic] out of the motel." (ECF No. 922, PageID.8795-8796). Bell introduced B.D. to twelve to fifteen different women who engaged in commercial sex acts at the Victory Inn. (ECF No. 922, PageID.8796). B.D. described Bell's team, including himself, as J.G., Avery, Nero, Randol, and "the women and Mr. Bell." (ECF No. 922, PageID.8798). All the drugs B.D. sold at the Victory Inn came from Bell or Avery. (ECF No. 922, PageID.8810).

J.G. also provided testimony that Bell was the source of drugs at the Victory Inn. J.G. was present when Bell sold drugs to Randol. (ECF No. 917, PageID.8122). On five separate occasions, J.G. delivered drugs for Bell to the Victory Inn. (ECF No. 917, PageID.8123). One time, while sitting at the front

desk, J.G. asked Randol if he was going to need anything, referring to drugs. (ECF

No. 918, PageID.8146-8147, Gov. Ex. 2.013). After Randol answered in the

affirmative, J.G. suggested that her and Bell meet Randol "on the side of the

building at 6:30 in the morning before [J.G. started her] shift." (ECF No. 918,

PageID.8147-8148). They met at the side of the building where the camera had a

blind spot. (ECF No. 918, PageID.8148).

A.P. was in Avery's room when he answered the phone "[w]hat up doe

Ghost, [those] were his exact words." (ECF No. 916, PageID.7833). After the call,

Avery "would leave from anywhere for 15 minutes to an hour . . . and come back

and have more drugs." (ECF No. 916, PageID.7833). When Avery, Bell's principal

drug dealer, came back with large amounts of drugs, "[t]hey would be in sacks."

(ECF No. 916, PageID.7834). Per A.P., Avery would replenish his drug supply,

from Bell, "at least three times a day . . . throughout a 24-hour time period." (ECF

No. 916, PageID.7836). Avery repeatedly needed more drugs from Bell because, at

times, per A.P., Avery would run out in as few as "five hours." (ECF No. 916,

PageID.7837).

S.N. testified that Bell "would come in and cut up his drugs and leave some

with [Seven] that was to be sold." (ECF No. 914, PageID.7580). Both A.P. and

S.N. explained that the drugs "would be in individual 10 dollar sacks." (ECF No.

914, PageID.7580). "The sack is the bag with the, all the packs [of drugs] in it

together." ECF No. 914, PageID.7580-7581). On one occasion, J.G. collected drug

money, "over three grand," from Avery, and delivered the money to Bell. (ECF

No. 918, PageID.8235-8236).

J.G. testified that Bell was at the Victory Inn "[t]o drop off drugs or do – it

was business." (ECF No. 917, PageID.8048). She identified Avery as someone

who worked for Bell as a pimp and a drug dealer. (ECF No. 917, PageID.8049,

8064). Additionally, on two or three occasions, at Bell's request, J.G. changed

Bell's "[f]ive's, 10s, 20s, singles" into "hundred dollar bills." (ECF No. 918,

PageID.8140-8141). J.G. testified that "[t]he first time it was a few thousand

dollars and then the second two times, it was 9,000 dollars."

Part of Bell's success, according to A.P., was that the dope Avery received

from Bell, was "the best" and an "11" out of "10." (ECF No. 916, PageID.7851).

She said Bell "had wonderful dope, very strong, it was way better than what I was

used to doing . . . ." (ECF No. 914, PageID.7549). Because Bell provided the

Victory Inn with high-quality drugs, A.P. knew she was getting Bell's drugs from

his crew/dealers, Randol, Nero, B.D., Honey, and Ford. (ECF No. 916,

PageID.7851-7852, 7859).

S.N., A.P., and J.G. identified Honey, a woman at the Victory Inn, as one of

Bell's drug dealers. (ECF No. 914, PageID.7563; ECF No. 916, PageID.7859; ECF

No. 917, PageID.8081). After selling drugs to A.P., Honey reminded A.P. to pay

7

her debt or face Bell. Honey told her "[t]o make sure that I brought her back the money that I owed her right away because Tone doesn't play about his money." (ECF No. 916, PageID.7859). Honey also told A.P., "you just didn't want to get on his bad side and that he was a scary individual." (ECF No. 916, PageID.7860). J.G. testified that Honey's room was very busy. (ECF No. 917, PageID.8090). "Lot of traffic going in and out . . . her serving people like two minutes, like one minute, . . . just lines in and out of her room." (ECF No. 917, PageID.8090). On two occasions, J.G. brought drugs to Honey from Bell. (ECF No. 917, PageID.8090-93).

Bell took R.A. to the Victory Inn for her first and only time. (ECF No. 970, PageID.10518-10519). Bell brought a "large plastic bag filled with drugs that had already been separated and bagged individually." (ECF No. 970, PageID.10520). Bell got out of the car with the bag of drugs, and returned to the car without the bag. (ECF No. 970, PageID.10520). Bell also took R.A. to codefendant Charles Ford's home where Bell dropped off drugs. (ECF No. 970, PageID.10521). R.A. testified that, even while they were on the run in Lima, Ohio, Bell was selling "drugs he would get from Detroit." (ECF No. 970, PageID.10529).

Every witness that spent time in the Victory Inn identified Darrick Bell as the drug dealer who supplied the Victory Inn and the coconspirators.

8

C.     "I hate to say it like this, but we have an ATM between our legs . . . ."

To illustrate how much money Bell made from the women who engaged in commercial sex acts, A.P. vividly explained, "I hate to say it like this, but we have an ATM between our legs . . . ." (ECF No. 916, PageID.7829).

A.P. testified, "every female that was at the Victory, in one way or another, was a working girl." (ECF No. 916, PageID.7829). When asked how many of the women at the Victory Inn were addicted to drugs, A.P. responded "[a]ll of them." (ECF No. 916, PageID.7845-7846). S.N. also indicated that all the women were addicts and engaging in prostitution to pay for the drugs. (ECF No. 914, PageID.7576). K.G. reported he saw prostitution taking place at the Victory Inn. (HSI ROI 077, Aug. 24, 2017, 2). S.V. testified that all the women she knew, who engaged in sex dates, were also addicted to drugs. (ECF No. 920, PageID.8472). S.V., within a 24-hour period, was high "[a]t least 22 of it." (ECF No. 920, PageID.8470, 8689). B.D. testified that "the prostitutes, the ones that was selling they self [sic]," would buy drugs he sold for Bell multiple times a day. (ECF No. 922, PageID.8800).

A.P. testified "[s]o we would get the drugs upfront on credit or what not and we would have to do dates to pay for it and that was happening every day all day. That's how we kept the cycle going." (ECF No. 916, PageID.7829). A.P. got her money for the drugs from "Michigan Avenue or just one of your regulars to date,

to catch a date . . . ." (ECF No. 916, PageID.7841). There was almost no other way for her to get money to purchase drugs. (ECF No. 916, PageID.7841). A.P. would earn cash from a date and, "in less than 30 minutes," buy drugs with the same money. (ECF No. 916, PageID.7845). A.P. "lost count" of the amount of times she was in Avery's room and saw other girls also get drugs on credit. (ECF No. 916, PageID.7845). A.P. herself was "using heroin, . . . on a daily basis . . . ." (ECF No. 916, PageID.7818). The quick turnaround from the date to the drugs was one of the benefits of the Victory Inn. (ECF No. 916, PageID.7845). S.N. was also fronted drugs from Bell. (ECF No. 914, PageID.7564). S.N. said that Bell knew they were doing dates for money for drugs because "there's no other way for us to make money and he had other girls . . . that's what everybody was doing . . . ." (ECF No. 914, PageID.7570).

S.V. posted online prostitution advertisements on Backpage.com with Bell and other girls. (ECF No. 921, PageID.8694-8695). S.V. and another woman did sex dates for Bell. ((ECF No. 921, PageID.8689). S.V. was asked if she would describe Bell as a pimp and responded "yes." (ECF No. 920, PageID.8554 ). J.G. testified that Bell was involved in prostitution at the Victory Inn. (ECF No. 917, PageID.8048).

Part of Bell's team, B.D., Avery, and Randol, were trafficking fifteen to twenty women at one point. (ECF No. 922, PageID.8831). J.G. testified that

Avery, who worked for Bell, would "get rooms from me for short stays . . . ." (ECF No. 917, PageID.8065). Short stays were indicative of commercial sex acts. J.G. would observe men "going in and out of [Avery's] room." (ECF No. 917, PageID.8066). J.G. identified Randol as a pimp who worked for Bell the last few months. (ECF No. 917, PageID.8067). "Randol pimped Angie." (ECF No. 917, PageID.8067). Cellular phone evidence at trial corroborated J.G.'s testimony.

To boost the commercial sex acts and drug trafficking, Bell provided the women with rooms for dates and an opportunity to sell drugs to the "johns." S.N. testified that Bell got rooms for the prostitutes. (ECF No. 914, PageID.7549). B.D. explained that, the fifteen to twenty women Bell's crew trafficked, stayed "in the rooms that was [sic] being offered to be rented," throughout the hotel. (ECF No. 922, PageID. 8832-8832) S.N. said that there were "multiple girls that were [Bell's] girls . . . and everyone else that was living there was buying his drugs," including her. (ECF No. 914, PageID.7553, 7555). J.G. testified that Bell paid for the rooms at the Victory Inn for the purpose of advancing the aims of the conspiracy. "So he had almost the entire top upstairs [sic] belonged to him and the agreement was that the girls had to buy drugs from his crew and he would be paying for the rooms." (ECF No. 917, PageID.8075). At the "peak of Tone's . . . power," he paid for almost 20 rooms at the Victory Inn at a cost of almost $2,700 per week. (ECF No. 917, PageID.8076). Prostitutes and some of Bell's drug

dealers stayed in Bell's rooms. (ECF No. 917, PageID.8076). Avery and B.D. paid for their own rooms but got a weekly rate because "they were [Bell's] people." (ECF No. 917, PageID.8076). J.G. explained that many of the rooms, registered under an alias or in the name of a coconspirator, were actually controlled by Bell. (ECF No. 918, PageID.8203).

For the women, a room at the Victory Inn was safer than doing commercial sex acts in "abandoned homes," "the homes of strangers," "cars", and "on the street." (ECF No. 914, PageID.7552-7553). A room allowed the women to "get more johns" and engage in more dates in shorter amounts of time. (ECF No. 914, PageID.7553). More dates meant more drug sales (the johns purchased drugs and the women had more money to purchase drugs). More drug sales meant more money for Bell. Renting rooms for the women increased drug sales and kept the women purchasing drugs from the members of his drug trafficking conspiracy.

Further evidence of Bell's involvement in the sex trafficking conspiracy were the meetings that took place at the Victory Inn. Bell ran many meetings at the Victory Inn with some of the co-conspirators and the women. (ECF No. 918, PageID.8236; ECF No. 922, PageID.8851). Bell held the meetings to "just get brought up to speed as to what was going on at the motel . . . grievances that the women might have had . . . if they . . . needed some more protection or if the johns was [sic] messing with them." (ECF No. 922, PageID.8851). J.G observed a

meeting in B.D.'s room where "a bunch of prostitutes" were present. (ECF No. 917, PageID.8098.) B.D. indicated that, on occasion, Bell complained "the money wasn't coming quick enough or that they needed to start paying for their rooms first." (ECF No. 922, PageID.8852). B.D. explained that Bell "[w]anted them to be out there . . . the streets that they walked up and down prostituting."

On May 23, 2015, in an incident away from the Victory Inn, Officer Edgell, with the Farmington Hills Police Department, was on routine patrol. He effectuated a traffic stop on a vehicle with Bell in the front passenger seat and Elizabeth Dehart (a.k.a. Seven) in the rear seat. (ECF No. 915, PageID.7777-7778). During the stop, Bell referred to Seven as his girlfriend. (ECF No. 915, PageID.7778). Bell had $2,000 in his pocket and Dehart, at 4:40 a.m., had "a very form-fitting cocktail-type dress with high heels . . . ." (ECF No. 915, PageID.7780). Edgell was "suspicious there was some prostitution involved." (ECF No. 915, PageID.7778-7780). On Dehart's person was a "ledger that had notes that . . . were indicative of prostitution." (ECF No. 915, PageID.7784). Specifically, six to twelve entries with "a man's name, a phone number, a dollar amount and a time indication, half hour or an hour." (ECF No. 916, PageID.7804). Dehart had provided a telephone number during the traffic stop. (ECF No. 916, PageID.7805). An internet search of Dehart's number revealed an advertisement for commercial sex acts with Dehart. (ECF No. 916, PageID.7806-7807). Edgell's testimony, in conjunction with other

13

testimony at trial, established that Bell was facilitating Dehart's commercial sex acts.

The testimony established Bell's role in facilitating the sex trafficking of many of the women at the Victory Inn.

D.     Bell would say, "[d]on't make me beat your ass, get my money."

Bell and his co-conspirators used violence and threats of violence to ensure, after the drugs were sold on credit, the women paid their debt.

A.P. testified that, if you did not pay them back, you would face "[p]hysical abuse, umm, you'd be slapped. I've seen girls get grabbed by their hair and thrown on the ground, umm, they could stop you from going to catch another date and just let you be sick the next day. Umm, it was just a number of things." (ECF No. 916, PageID.7846). If they let the women get dope sick, by withholding drugs, the women would feel like they were "near death." (ECF No. 916, PageID.7847). A.P. saw "girls get backhanded and I've seen girls get not a closed fist, but a closed hand like this across their face, in their mouth, seen them grabbed by their hair and shoved down to the ground. Umm, I've seen girls be threatened to be burned with crack pipes." (ECF No. 916, PageID.7848). A.P. observed "Nephew [Harold Nero], Brian Daugherty, Shelvie Avery, Charles Ford and Michael Randol" engage in violence over a drug debt. (ECF No. 916, PageID.7850). S.N. said Bell would

14

tell her, "[d]on't make me beat your ass, get my money." (ECF No. 914, PageID.7577).

J.G. testified that getting Bell involved in a situation at the Victory Inn meant physical harm and consequences. (ECF No. 917, PageID.8055). And Bell did not act alone. The testimony showed that Bell brought B.D. to the Victory Inn to act as an enforcer. J.G. testified that Bell hired B.D. "to be up there to make sure if anything is wrong, I'm supposed to go to him and he's supposed to handle it." (ECF No. 917, PageID.8056). He was the "muscle man" who also "sold drugs for [Bell] up there." (ECF No. 917, PageID.8057). J.G. identified a video where B.D. had Tone's baseball bat. (ECF No. 917, PageID.8058). She testified that Bell "broke [Seven's] toe with [that bat]." (ECF No. 917, PageID.8058). On another occasion, J.G. saw Bell, who was angry, pinch the top of Honey's collar bone area so hard he almost brought her to her knees. (ECF No. 917, PageID.8098). When Mona, a prostitute at the Victory Inn, owed Bell money for drugs, Bell told J.G. "if this bitch was in front of me, I would choke the fuck out of her." (ECF No. 917, PageID.8119).

K.G. reported that Seven referred to Bell as her boyfriend. B.D. testified that Seven/Dehart was Bell's girlfriend. (ECF No. 922, PageID.8784). J.G. testified that Seven introduced Bell as her boyfriend. (ECF No. 917, PageID.8042). Seven told K.G. that Bell "hit me after I asked him if he was fucking [Tawfik]." (HSI

15

ROI 77, Aug. 24, 2017, 3). In the Summer of 2016, Seven told K.G. that Bell "hit

her again" when he saw her bloody mouth and eye. (HSI ROI 77, Aug. 24, 2017,

3). Days later, K.G. saw Seven get out of a car with Bell. (HSI ROI 77, Aug. 24,

2017, 3). As they walked to "their" second floor room, Seven "was wearing a scarf

wrapped around her head. (HSI ROI 77, Aug. 24, 2017, 3). Later that day, when

Seven came to the front desk, K.G. noticed "her hair had been completely shaved

off and she was bald." (HSI ROI 77, Aug. 24, 2017, 3). K.G. asked what happened

to her hair and Seven responded, Bell "shaved it as a punishment." (HSI ROI 77,

Aug. 24, 2017, 3). J.G. asked Bell about Seven's shaved head. (ECF No. 917,

PageID.8108). Bell told J.G., "something to the matter of next time' it'll be her ear

and that was his answer about that." (ECF No. 917, PageID.8108).

B.D. testified that, in 2016, he saw Bell on Tillman Street. (ECF No. 922,

PageID.8869). Bell looked mad and Seven, who was also there, was crying and

looked scared. (ECF No. 922, PageID.8869-8870). B.D. explained that Bell,

"asked me if I had the trimmers. I told him I did. I went and grabbed the trimmers

and gave them to him. He had Seven in one of the rooms in the apartment building

and he began shaving her head." (ECF No. 922, PageID.8870). Seven, "was just

standing there crying frantically . . . ," as Bell shaved her head. (ECF No. 922,

PageID.8870). Bell kept repeating, "this [bitch] keep messing up, F'ing up." (ECF

No. 922, PageID.8871). According to A.P., if you "cross somebody that sold dope

16

or your boyfriend . . . they would shave your head . . . it would stop you from catching dates on Michigan [Avenue]." (ECF No. 916, PageID.7864). If you cannot get dates, you cannot buy drugs. If you cannot buy drugs, you get dope sick.

While in the front office, J.G. "would hear [Seven] screaming and crying . . . . I would hear a lot of banging . . . ." (ECF No. 917, PageID.8104). J.G. saw Bell punch Seven and, while she was on the floor, "he kicked her in her stomach . . . ." (ECF No. 917,PageID.8105-8106).

The evidence at trial established that violence was a part of the culture at the Victory Inn. Bell, and his coconspirators, used violence as a tool to both terrorize and incentivize the women and others to pay their drug debt.

E.    "I hoped eventually he would be my husband"

The Victory Inn was not the first time Bell operated a drug and human trafficking conspiracy. In February of 2014, Bell ran a drug and sex trafficking operation out of R.A.'s home in Pontiac. *See* Government's Motion in Limine to Admit Evidence Pursuant to 404(b), ECF No. 724. As argued in the motion, the Pontiac operation had numerous similarities to the Victory Inn. The similarities that stand out include fronting drugs, the use of violence, and the manipulation of a woman to oversee his operation.

Bell engineered relationships with R.A. and J.G. to facilitate both the Pontiac and Victory Inn drug and sex trafficking conspiracies. Both R.A. and J.G.

17

were useful to Bell. In Pontiac, R.A. had a house particularly suitable for sex

trafficking. R.A.'s home had a basement with a door that led directly to the

outside. Bell used the basement to facilitate the commercial sex acts. J.G. was a

female clerk at the Victory Inn who had access and control over the motel rooms.

J.G. was able to give Bell unlimited access to multiple rooms to facilitate both the

drug and sex trafficking.

Both R.A. and J.G. were emotionally vulnerable which made it easy for Bell

to lure them into a relationship. R.A. was a single mother living in Pontiac. When

she first met Bell, he spent time and money on her and her children. (ECF No. 970,

PageID.10508). R.A. testified that the beginning of their relationship "went very

well." (ECF No. 970, PageID.10507). She eventually fell in love with Bell. (ECF

No. 970, PageID.10507). R.A. "hoped eventually he would be [her] husband."

(ECF No. 970, PageID.10508). R.A. told her family about Bell and how much he

meant to her. After she lost her job, she became reliant on Bell. Bell recognized he

was her only source of income, and introduced her to drug dealing as a way to pay

the bills. As an unemployed single mother, R.A. thereafter became reliant on Bell.

From there, the relationship got worse and worse. (ECF No. 970, PageID.10508).

Bell also manipulated J.G., who was recently divorced from a 20-year

marriage. Bell, realizing how J.G. could help assist in his illegal activities, began

spending time with J.G. and ingratiating himself to her and her family, even

18

offering to buy expensive shoes for J.G.'s son. J.G. saw Bell as "everything [her] husband wasn't . . . ." (ECF No. 917, PageID.8045). Bell made her feel "respected," and she started developing feelings for him. (ECF No. 917, PageID.8046-8047). She believed he developed feelings for her. (ECF No. 917, PageID.8047). J.G. also told her family "she met another man . . . ." (ECF No. 917, PageID.8050). The relationship developed to the point where J.G. wanted nothing more than to please Bell. (ECF No. 917, PageID.8080).

At one point, Bell had both women distributing drugs on his behalf and facilitating his human trafficking operations. They both went to extreme lengths to protect Bell. R.A. helped Bell avoid capture for two and a half years. Tawfik met with Bell immediately after the Victory Inn was raided. At his request, Tawfik drove him around while he gave burner phones to seven or eight "men and younger boys." (ECF No. 918, PageID.8240). After exchanging Tawfik's burner phone, he told her to lie to the police and gave her "instructions on what to say when I was questioned." (ECF No. 918, PageID.8241). Later that day, she went to the Victory Inn and, as instructed, lied to the police. (ECF No. 918, PageID.8243). They had phone contact an additional four or five times. (ECF No. 918, PageID.8244). Bell turned to J.G. for information she might have about the investigation. (ECF No. 918, PageID.8244). J.G. never told the police they were in contact and continued to protect Bell. (ECF No. 918, PageID.8245).

## II.     The Sentencing Guideline Range

The government and the United States Probation Department agree that

Bell's advisory guideline range is 360 months to life.

### A.     USSG § 2D1.1(5), the converted drug weight

The government must prove the weight of any drugs by a preponderance of

the evidence. *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000). The

Court must choose an estimate that protects a defendant from a drug quantity

higher than what they are actually responsible for. *United States v. Jeross*, 521

F.3d 562, 578 (6th Cir. 2008) (internal citations omitted). The evidence "that the

district court relies on to support the estimate 'must have a minimal level of

reliability' and the court should 'err on the side of caution in making its estimate.'"

*United States v. Histed*, No. 22-2080, 2024 WL 726245, at *3 (6th Cir. Feb. 22,

2024) (internal citations omitted). The Sixth Circuit has "affirmed district courts'

drug-quantity determinations that used ascertainable methodologies to arrive at a

conservative estimate of drugs." *Id*. at *4.

The government has conservatively estimated the drug quantities attributable

to Bell. The estimate is based on the trial testimony given under oath, Rule 11 Plea

Agreements, and a Dearborn Police Department report.

Bryant Daugherty started working full time as a drug dealer at the Victory

Inn between mid-summer and late summer of 2016. (ECF No. 922, PageID.8794).

20

He was initially introduced to twelve to fifteen women who worked for Bell and engaged in commercial sex acts out of the Victory Inn. (ECF No. 922, PageID.8795-96). When he first sold drugs at the Victory Inn, he had never seen so many people, so quickly, come to purchase crack cocaine. (ECF No. 922, PageID.8791). Later, as a permanent drug dealer at the Victory Inn, he sold drugs over and over "throughout the course of the day or the week." (ECF No. 922, PageID.8799).

The women at the Victory Inn purchased Bell's drugs from Daugherty, Avery, and Randol. (ECF No. 922, PageID.8800). Daugherty testified they bought from him "multiple times a day." (ECF No. 922, PageID.8800). Daugherty purchased drugs from Bell or Avery. (ECF No. 922, PageID.8810). From his arrival in the summer until his arrest on January 12, 2017, he was always at the Victory Inn. (ECF No. 922, PageID.8813). Over his four to five months at the Victory Inn, Daugherty sold crack cocaine until he started also selling heroin. (ECF No. 922, PageID.8813-14). He started selling heroin because the "girls wanted it." (ECF No. 922, PageID.8813).

1.   Quantity of crack

The traffic in Daugherty's room was the same as it was the first day he arrived. (ECF No. 922, PageID.8816). With that kind of traffic, Bell provided Daugherty an eight ball (3 grams) to a quarter (6 grams) of crack every three or

four days. (ECF No. 922, PageID.8814). Using the lower amount (3 grams) and the least amount of days (every four days), and starting with the very end of summer (September 1, 2016), Daugherty received 3 grams of crack cocaine, every four days, for four months. If he received 3 grams of crack cocaine from September 1, 2016 (end of summer) to January 12, 2017 (date of arrest), he received at least 100.5 grams of crack over 134 days.

Other than Bell, Avery sold the most crack at the Victory Inn. (ECF No. 922, PageID.8816). Daugherty was in Avery's room, saw his transactions, quantity of drugs, and room traffic. (ECF No. 922, PageID.8816). Avery sold higher amounts; two to four and a half ounces (56.6 to 127.5 grams) of crack cocaine. (ECF No. 922, PageID.8815). Avery preceded Daugherty's arrival at the Victory Inn. (ECF No. 922, PageID.8787). Nevertheless, assuming Avery received 56.6 grams of crack cocaine at the same frequency as Daugherty (every four days), starting on September 1, 2021, he would have sold 1,896 grams of crack cocaine over the 134 days.

Randol also sold crack cocaine at the Victory Inn. Pursuant to his Rule 11 Plea Agreement, Randol sold at least 840 grams of crack cocaine. (Randol Rule 11, pg. 8; ECF No. 922, PageID.8817).[1] Not including the crack sold by Nero (ECF No. 922, PageID.8840), between Daugherty, Avery, and Randol, Bell's drug

---

[1] The Plea Agreement for Michael Randol is under seal.

trafficking conspiracy sold approximately 2,836 grams of crack cocaine. The equivalent converted drug weight is 10,129,498 grams or 10,129 kilograms.

      2.   Quantity of heroin

Trial testimony established that Bell was distributing heroin from the Victory Inn as early as September 16, 2016. (ECF No. 914, PageID.7591-92). S.N. testified that, on September 16, 2016, she received heroin from Bell. (ECF No. 914, PageID.7592). Subsequent testimony established that, later that day, she was taken to Detroit Receiving Hospital for swallowing 50 to 60 dollars of heroin. (ECF No. 914, PageID.7593; ECF No. 911, PageID.7188). A Dearborn Police Department report documented a member of the conspiracy distributed heroin as early as October 11, 2016. (Discovery, 1544-1544.09). The Dearborn Police Department conducted an in-custody interview with an individual who purchased heroin from Randol (a.k.a. "Man") in room 216 at the Victory Inn. On October 24, 2016, a Dearborn Police Department confidential informant (CI) reported that Randol sold him crack cocaine out of room 216. On November 4, 2016, A prostitute at the Victory Inn reported that Avery (a.k.a. "Q") was selling crack and heroin at the Victory Inn supplied by Bell (a.k.a. "Tone"). On November 23, 2016, a different CI , reported that "Q" supplies heroin, crack, and also ran prostitutes out of the Victory Inn.

Bell provided heroin to Avery who, in turn, provided Daugherty a gram of heroin every three to four days. (ECF No. 922, PageID.8815, 8823, 8825). Daugherty paid $100 for a gram. (ECF No. 922, PageID.8823). He would turn the gram into 20 individual packs of .5 grams of heroin which he sold for $10 each. (ECF No. 922, PageID.8823). The "girls mostly bought the heroin . . . ," they were the "primary customers . . . ." (ECF No. 922, PageID.8824).

The girls spent $100 to a couple hundred dollars, throughout the day, depending "if they made enough money prostituting that they could afford to continue to buy that amount." (ECF No. 922, PageID.8824-25). A.P. testified she used heroin on a daily basis because "it was cheaper for me to do the heroin throughout the day that it was the crack . . . ." (ECF No. 916, PageID.7818). S.V. testified she used heroin multiple times in a 24-hour period. (ECF No. 920, PageID.8467-68). S.V. was high "at least 22 [hours]" of a 24-hour period. (ECF No. 920, PageID.8470). S.V. testified that (1) Avery had more than ten women "doing sex dates and giving money" to Avery; and (2) Avery got his drugs from Bell. (ECF No. 920, PageID.8514-15). A.P. told the jury that all of the women at the Victory Inn were addicts. (ECF No. 916, PageID.7845-7846).

The conspiracy controlled approximately 15 to 20 girls who stayed in the rooms at the Victory Inn. (ECF No. 922, PageID.8831-32). A.P. testified that anywhere from 5 to 10 girls were doing dates and coming back to Avery's room

24

for more drugs. (ECF No. 916, PageID.7846). Both Avery and Randol were involved with trafficking the women. (ECF No. 922, PageID.8832). Avery would use the heroin to control the girls. (ECF No. 922, PageID.8834). The girls were supposed to buy their drugs from Daugherty, Avery, Randol, and, at times, Nero. (ECF No. 922, PageID.8840). If they purchased drugs from someone outside the conspiracy, they would get "put out" of the hotel and onto the streets. (ECF No. 922, PageID.8840).

On the low end, Daugherty sold "the girls" approximately $100 of heroin a day or .5 grams. Daugherty was at the Victory Inn on September 16 (when S.N. received heroin from Bell and overdosed) and the 119 days that followed until his arrest on January 12, 2017. The evidence established that Daugherty sold at least .5 grams of heroin, every day, for 119 days, or 59.5 grams of heroin, to each female engaged in commercial sex acts. If Daugherty sold to five of the 15 to 20 women controlled by the conspiracy, he sold 297.5 grams of heroin at the Victory Inn.

A.P testified that Avery sold heroin to five to ten girls a day. Daugherty testified Avery had twelve girls, give or take. (ECF No. 922, PageID.8833). If Avery sold the same amount of heroin to 7 girls every day for the same amount of time (even though he was at the Victory Inn before Daugherty), Avery sold 416.5 grams of heroin.

25

Randol's Rule 11 Plea Agreement indicates that he also sold heroin from 2015 through January of 2017. Nevertheless, if he sold the same amount of heroin for the same amount of time as Daugherty, he sold 297.5 grams. In total, the three coconspirators sold a total of 1,011.5 grams of heroin or a converted drug weight of 1,011.5 kilograms.

### 3. Total converted drug weight

The total converted drug weight of the crack cocaine (10,129 kilograms) plus the converted drug weight of heroin (1,011.5 kilograms) equals 11,140.5 kilograms. Under USSG § 2D1.1(c)(3), Bell is at an offense level 34.

### 4. Powder-to-crack disparity

The Department of Justice supports elimination of the powder-to-crack sentencing disparity. The Court has absolute discretion to consider whether the powder-to-crack disparity is warranted in assessing the Section 3553(a) factors. For the Court's convenience, applying the cocaine drug conversion ratio to determine the converted drug weight for the crack attributable to the conspiracy and Bell, the converted drug weight becomes 567.3 kilograms. Added to the converted drug weight for the heroin (1,011.5 kilograms), the total converted drug weight becomes 1,578.8 KG. Under USSG § 2D1.1(c)(5), this converted drug weight puts Bell at an offense level 30.

26

B.    USSG § 2D1.1(b)(1), a dangerous weapon was possessed

Bell objected to the scoring of USSG § 2D1.1(b)(1). "The § 2D1.1(b)(1) firearms enhancement can be applied to a defendant's sentence if the defendant could have reasonably foreseen that a co-conspirator had weapons in connection to the drug conspiracy." *United States v. Gross*, 77 F. App'x 338, 343 (6th Cir. 2003). "'[T]he enhancement of a sentence can be imposed only on the basis of the defendant's conduct or the conduct of co-conspirators in furtherance of the conspiracy that was known to the defendant or was reasonably foreseeable.'" *Id*. (quoting *United States v. Williams*, 894 F.2d 208, 212 (6th Cir.1990))." *United States v. Benson*, 591 F.3d 491, 504 (6th Cir. 2010).

There are six factors the Court can consider when determining the application of § 2D1.1(b)(1): "(1) the type of firearm involved; (2) the accessibility of the weapon to the defendant; (3) the presence of ammunition; (4) the proximity of the weapon to illicit drugs, proceeds, or paraphernalia; (5) the defendant's evidence concerning the use of the weapon; and (6) whether the defendant was actually engaged in drug-trafficking, rather than mere manufacturing or possession. *United States v. Edmonds*, 9 F. App'x 330, 332 (6th Cir. 2001).

In *Benson*, the Sixth Circuit held that the application of the two-level enhancement for the possession of a firearm was not clearly erroneous because

27

"Benson knew or could have reasonably foreseen that Humphry, a major drug

trafficker, possessed weapons in the residence where he kept a significant drug

supply and thousands of dollars in currency." *Benson*, 591 F.3d at 505. Therefore,

"the application of the two-level enhancement for the possession of a firearm was

not clearly erroneous as it was reasonably foreseeable that Benson knew the

weapons would be used in furtherance of the conspiracy." *Id*.

"In the government's favor, unlike a hunting rifle or antique firearm, the

firearms here do not have an obvious purpose unrelated to drug trafficking."

*United States v. Kennedy*, 65 F.4th 314, 320 (6th Cir. 2023), *reh'g dismissed*, No.

21-1741, 2023 WL 3302118 (6th Cir. May 2, 2023), *vacated*, No. 21-1741, 2023

WL 4362488 (6th Cir. July 3, 2023). Like the defendant in *Kennedy*, Bell "was

engaged in drug-trafficking, not mere manufacturing or possession, and offered no

evidence concerning use of the firearms unrelated to drug crimes." *Id.* at 320. Once

the government establishes the applicability of the enhancement by a

preponderance of the evidence, "the burden shifts to the defendant to show that it

was "clearly improbable" that the weapon was connected to the offense." *United

States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007); *see also United States v.

Greeno*, 679 F.3d 510, 516 (6th Cir. 2012), abrogated on other grounds by *New

York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) (citations omitted)

("If a defendant fails to meet his or her burden of showing that it was clearly

improbable that a firearm was connected to a drug offense, 'the district court should apply the enhancement'"); and *Benson*, 591 F.3d at 504 ("Benson did not meet his burden of proving that it was clearly improbable that the two firearms were related to the conspiracy.")

Here, the evidence that Bell's coconspirator's had firearms in connection with the drug conspiracy is overwhelming. First, evidence at trial showed that Avery and Daugherty had access to firearms that were in close proximity to the drugs. B.D. testified he saw Avery, in his room, with three firearms. (ECF No. 922, PageID.8842). Avery had the guns "just laid out in a room." (ECF No. 922, PageID.8843). B.D. testified he saw Avery with the three firearms laid out next to the drugs. (ECF No. 922, PageID.8842-43). Bell's hand-picked enforcer, B.D.— who Bell designated as the doorman, enforcer, and protector of J.G.—had a .38 revolver in his room at the Victory Inn. (ECF No. 922, PageID.8863). Second, the guns had ammunition. A video from the robbery of Avery and Randol, at the Victory Inn, showed a firearm was discharged when they attempted to shoot at the robber. Third, Bell knew his coconspirators had and used guns because J.G. called Bell after the Randol and Aver robbery "reporting to him what happened . . ," and that she "heard the gunshots." (ECF No. 918, PageID.8223, 8226).

Fourth, Bell ran a high-volume drug trafficking operation out of the Victory Inn. Johns, prostitutes, other drug dealers, and drug addicts regularly resided or

29

visited the Victory Inn. The operation generated large amounts of cash and involved storing a large amount of drugs. To Bell, it was reasonably foreseeable that the sheer size of the operation created high visibility and the potential for trouble. As a result, he brought B.D. to the Victory Inn to protect the drug and sex trafficking conspiracies. Bell also had Nero act as an enforcer. (ECF No. 922, PageID.8847). J.G. also carried a gun at the Victory Inn.

Bell also knew that his coconspirators/drug dealers lived in the same rooms where the drug users regularly purchased the drugs. This made the location of the drugs and money predictable and vulnerable, which is why the residents of some of those rooms, B.D. and Avery, both had firearms. If at least three of Bell's coconspirators—B.D., J.G., and Avery—foresaw the need to possess a firearm at the Victory Inn, it was certainly reasonably foreseeable to Bell. Especially given that the drugs, money, and motel they were protecting were controlled by Bell.

Additionally, Bell has prior convictions for possessing firearms and distributing controlled substances. When Bell was arrested in 1990 for possession with intent to distribute, he was in possession of drugs, cash, and a .22 caliber automatic handgun. PSR ¶ 40. In 1990, Bell recognized the need to carry a firearm to protect his drugs and money. Over twenty years later, he had to know that his astronomically larger drug operation, next to the main drag for prostitution, in

30

Detroit, would need protection. Consequently, it was reasonably foreseeable that at least one coconspirator had firearms in connection with his drug conspiracy.

C.    USSG §2D1.1(b)(2), the use of violence enhancement

The use-of-violence enhancement applies "if the defendant used violence, made credible threats to use violence or directed the use of violence." U.S.S.G. § 2D1.1(b)(2). The Probation Department correctly concluded that this enhancement applied against Bell.

The guidelines do not require that a defendant use a weapon when making the credible threat. Additionally, the violence does not need to be carried out to support the enhancement. In *United States v. Lewis-Zubkin*, 907 F.3d 1103, 1104 (8th Cir. 2018), the court affirmed the application of the USSG § 2D1.1(b)(2) enhancement to a defendant who paid another person to commit assaults that never occurred. In *United States v. Kirk Tang Yuk*, 885 F.3d 57, 82–83 (2nd Cir. 2018), the court found the district court did not commit clear error in concluding that the defendant's comments that referenced "driving a car over" another individual was a credible threat, even if "the statements in question could be interpreted as innocent hyperbole". In *United States v. Redifer*, the Tenth Circuit ruled that the district court properly found that, "with regard to use of violence in an effort to collect on drug debts, the district court found that 'the  . . . incident was in fact

31

related to [sic] collection of drug debt,' and that violence or a credible threat of violence was used." 631 F. App'x 548, 563 (10th Cir. 2015).

The evidence at trial overwhelmingly supports this enhancement. The evidence established that Bell and his coconspirators used violence and threats of violence to collect drug debts. Bell specifically told S.N. he would beat her ass over money owed for drugs. A.P. testified she observed coconspirators engage in violence over a drug debt. Failure to pay a drug debt would subject the woman to "[p]hysical assaults". (ECF No. 917, PageID.8004). In Avery's room, A.P. saw women "get backhanded . . . girls get . . . a closed hand like across their face, in their mouth, . . . grabbed by their hair and shoved down to the ground. I've seen girls be threaten to be burned with crack pipes." (ECF No. 916, PageID.7848). A.P. testified that these punishments were given "[c]ause [the women] didn't have their money." (ECF No. 916, PageID.7848).

Honey warned A.P. to pay for the drugs or face Bell's consequences because Bell "doesn't play about his money." And, the violence recounted and documented by multiple witnesses, against Dehart (a.k.a. Seven), by Bell, was monstrous. S.V. testified that a consequence of not paying Avery back was "maybe he would hit [her]." (ECF No. 920, PageID.8497). S.V. saw Avery hit people in the past. (ECF No. 920, PageID.8497). When asked how she observed Avery, and people with

Avery, punish a woman who owed them money, S.V. responded "[h]it them. I've seen hair get cut off." (ECF No. 920, PageID.8501-8502).

Bell and his coconspirators used violence to collect drug debts. Accordingly, the use of violence enhancement applies.

D.    USSG §2D2.1(b)(12) – maintained a premises for the purpose of manufacturing or distributing a controlled substance

Internal Revenue Service Special Agent Christopher Gutenschwager testified extensively about his analysis of the room receipts from the Victory Inn. (ECF No. 924, PageID.9155,9165-9174). Gutenschwager found room receipts that showed Bell rented rooms in the name of Mark Haywood and Donte Prince. (ECF No. 924, PageID.9202). Mark Haywood was an alias for Bell. (ECF No. 918, PageID.8167). To protect Bell's identity, J.G. took the Mark Haywood driver's license from "a drawer of ID's of prior guests who [forgot] their ID so [she] used a fake name for Tone's room so [she could] protect Tone . . . ." (ECF No. 918, PageID.8167).

Under the names of Mark Haywood, Donte Prince, or Christopher Erve, there was a weekly entry that Bell shared a room with Seven and Liz. (ECF No. 924, PageID.9203,9206). Bell had rooms with a check-in date as early as April 8, 2016, and as late as December 31, 2016. (ECF No. 924, PageID.9201-9202). Sometimes the room receipt had Avery's name or Nero's name. (ECF No. 924, PageID.9202-9203). There were several other week-long Mark Haywood/Tone

33

entries in the books. (ECF No. 924, PageID.9203). In a May 15, 2016, entry, Theresa Duncan had a room with Liz, Seven, and "Tone." (ECF No. 924, PageID.9204). In a May 20, 2016, entry, a Mark Haywood was with Seven and "Tone" in the room. (ECF No. 924, PageID.9204). The clerk that wrote the room receipts was almost always J.G. (ECF No. 924, PageID.9206). Bell had room 205 for nine weeks. (ECF No. 926, PageID.9353). The IRS records were consistent with J.G.'s testimony.

J.G. testified that at one point, Bell maintained almost 20 rooms, had almost all the rooms upstairs, and paid $2,700 a week for rooms. (ECF No. 917, PageID.8075-8076). His coconspirators, Avery and B.D. got a weekly rate for rooms because they worked for Bell. (ECF No. 917, PageID.8076). J.G. explained that many of the rooms, registered under an alias or in the name of a coconspirator, were actually controlled by Bell. (ECF No. 918, PageID.8203).

B.D. testified at length that he was brought to the Victory Inn by Bell to sell drugs. Bell provided B.D. with the drugs and a room at the Victory Inn. And as B.D. testified, all he had to do was answer the door. Bell did not need twenty rooms if he was just a guest at the Victory Inn. Looking at the totality of the circumstances, Bell rented the aforementioned rooms to sell drugs and commercial sex acts.

34

E.     USSG §3B1.1(a) – aggravating role, organizer or leader

Bell was undeniably the leader and organizer of the criminal activities at the
Victory Inn. And the evidence is clear that the criminal activity involved five or
more participants and was otherwise extensive. Every witness that spent time in the
Victory Inn identified Bell as the leader of, at least, the drug trafficking conspiracy.
Witnesses identified Bell as the person who supplied the drugs to Avery, B.D., and
the other coconspirators. When his coconspirators were robbed, they immediately
reported the incident to their leader, Bell.

In his objection, Bell simply objects to being labeled as a "leader." Bell does
not support his objection with any evidence or testimony from the transcripts.
Likely because he cannot, as the evidence on this point is conclusive. The
Probation Department, the witnesses, the evidence, and USSG §3B1.1(a),
comment. (n.4) support the four-level increase.

## III.   Law and Argument

A.     The Court can consider acquitted conduct for sentencing

In the Sixth Circuit, "[c]ontrolling caselaw explicitly allows sentencing
courts to consider . . . acquitted conduct . . . ." *United States v. Wandahsega*, 924
F.3d 868, 887 (6th Cir. 2019). Further, "'the Sixth Amendment [does not] prevent
[ ] a district court from relying on acquitted conduct in applying an advisory
[sentencing] guidelines system. In the post-*Booker* world, the relevant statutory

ceiling is no longer the Guidelines range but the maximum penalty authorized by the United States Code." *United States v. Davis*, 407 F. App'x 32, 41 (6th Cir. 2011) (citing *United States v. White*, 551 F.3d 381, 384 (6th Cir. 2008) (en banc)). To consider the conduct, the Court must find facts supporting that conduct by a preponderance of the evidence. *United States v. Rankin*, 929 F.3d 399, 407 (6th Cir. 2019) (citing *White*, 551 F.3d at 383-84).

B.   The nature and circumstances of the offense and the history and characteristics of the defendant; 18 U.S.C. 3553(a)(1)

1.   The nature and circumstances of the offense

The Victory Inn was a hotel of horrors. There was often no vacancy because the rooms were full of women and victims living in unspeakable conditions as severe drug addicts. The remaining rooms were occupied by Bell and his coconspirators so that they could prey on the victims' addictions. The women's days and nights were hyper focused on drugs. Once they got drugs, they immediately fixated on getting more money to buy more drugs. They did not eat, sleep, see their families, retain custody of their children, or take care of themselves. They were defenseless, weak, and engulfed in an inescapable cycle of destruction. Darrick Bell understood that these women were helpless. He understood what they craved. He saw an opportunity to exploit that they were powerless against their dependence.

36

Bell also knew that to go without drugs was excruciating and that they would do anything to avoid getting dope sick. They wanted to avoid the nauseousness, cold sweats, hot flashes, pain, dry heaving, and anxiety associated with trying to get their next high. He understood they had very little, if any, options. Most importantly to Bell, he knew they would sell their bodies for drugs.

Bell started purchasing the women rooms at the Victory Inn because "otherwise they would be out in the elements. They would sleep in abandoned houses, sleep under bridges, tents, some girls would get tents and put them behind buildings." (ECF No. 914, PageID.7552). Once they had a room, "it was just known throughout the hotel and they would . . . drop their money off to Seven and get more, a new, fresh supply of drugs." (ECF No. 914, PageID.7553). From there, "every room basically was being used for either the girls or people that were selling drugs for him." (ECF No. 914, PageID.7555). Even more alluring, Bell and his coconspirators would sell drugs on credit at the Victory Inn.

Bell had dealers in the hotel, control of the rooms, and a clientele who literally could not live without drugs. He got money from selling drugs to the women, the johns, and people off the street. The money from the commercial sex acts rapidly flowed directly to Bell and his coconspirators as the women paid off their drug debts. Immediately, those same women incurred new debts when they acquired more drugs. Bell's drug and sex trafficking conspiracies raked in the cash.

37

If a woman did not pay for the drugs she got on credit, Bell and his coconspirators used violence as a recourse.

Bell made money on the backs of the most vulnerable and derelict women he could find. He ran his conspiracies with a cruel disregard for these women. In his eyes, their only value was the ATM between their legs.

2.        The history and characteristics of the defendant

Bell's criminal history demonstrates he has no respect for the law and is an absolute danger to the public. Bell has five consecutive convictions involving the possession of a firearm. His first conviction, in 1989, involved a felonious assault where he pointed a gun at a couple walking down the street in Greektown. Four months later, he was caught with another firearm and fled the police. Approximately eight and a half months later, he was arrested in possession of a firearm, cocaine, and over $600 in cash. Bell served a concurrent prison term for all three convictions. While in prison, he received five major misconducts. On his first parole, in January of 1992, he absconded.

While an absconder, he was arrested with a firearm. He returned to prison in October of 1993 as a parole violator and with his fourth firearm conviction. In May of 1994, he walked away/escaped from a parole camp. Twelve days later, Bell committed coldblooded murder by shooting a person in the head. In August of

1996, he was sentenced for second degree murder and felony firearm. He was discharged from parole on February 5, 2015.

His lengthy sentence for murder did nothing to deter his unlawful behavior. Even while on parole for murder, Bell was engaged in additional criminal conduct. On June 17, 2014, the Oakland County Sheriff's Office (OCSO) executed a search warrant at R.A.'s residence. The Sheriff's Department found substantial evidence of drug and human trafficking in the home. A woman found in the basement of the house reported that R.A.'s boyfriend, "Tone," gave her heroin. Later, she bought heroin from "Tone" and owed him money. "Tone" let her stay at R.A.'s house, as long as she got "dates" and paid down her debt by giving the money to "Tone" and R.A. R.A. provided the same information to law enforcement.

A review of R.A's phone showed multiple text messages between R.A. and "Tone"/Bell. (OCSO Rpt., 11-12). The messages clearly dealt with "dates" for the two women found in the basement. R.A. also gave updates to "Tone" about dates. The updates included who was on the way, how long they would be there, and what they would be paying. (OCSO Rpt., 11-12). When R.A. went to jail for her role in sex trafficking the women in her basement, Bell was nowhere to be found.

Bell's next known contact with law enforcement was on May 23, 2015, when Officer Edgell pulled him over in Farmington Hills. As discussed above, he

39

was with Seven, Bell's girlfriend who was actively engaged in trafficking drugs for Bell and commercial sex acts.

Despite his extensive criminal history and parole status, Bell was connected to drug dealing and human trafficking over a year before law enforcement began actively investigating the Victory Inn in September of 2016. Bell is the very definition of a career criminal.

C.   The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; 18 U.S.C. § 3553(a)(2)(A)

Victims of human trafficking are powerless. Between the drugs, the men that control them, the johns, their lack of adequate food and sleep, and the related dangers they face on a daily basis, they have to fight to survive. Bell exhibited a gross indifference to the women under his control. He mercilessly treated them as if they existed for the sole purpose of making him money. Bell lured the women to the Victory Inn with the promise of a room and ready-access to drugs. He knew that many of the women lacked the strength and conviction necessary to break free. In fact, he relied on their addiction to feed his bank account. Bell and his coconspirators worked together to impose control over the women through physical, emotional, and economic abuse. To Bell, the lives of the women meant nothing. They were simply tools of the trade that enabled him to make more money selling drugs.

The majority of the women in the surveillance videos, the women rescued on the day of the raid, and so many others either died, disappeared, or refused to cooperate with law enforcement. Only a few that survived agreed to testify in trial. The survivors' testimony, better than anything the government could write, illustrated the seriousness and destructive force of the Bell drug trafficking conspiracy and the human trafficking that took place at the Victory Inn. The witnesses spoke for themselves and the vast majority of human trafficking victims, known and unknown, who never had an opportunity to speak on their own behalf.

Since he was twenty years old, Bell has demonstrated an absolute lack of respect for the law. He repeatedly committed crimes with firearms and drugs while on parole. He was on parole for murder when he trafficked women in R.A.'s home in Pontiac. Just punishment for Bell, given his history and the totality of the evidence developed at trial, is 35 years.

D.   The need for the sentence imposed to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant; 18 U.S.C. § 3553(a)(2)(B) and (C)

Given the size and scope of Bell's drug trafficking conspiracy, and those who suffered in furtherance of the conspiracy, a strong sentence of 35 years will afford adequate deterrence. More importantly, a 35-year sentence will protect the public from Bell. For over 30 years, from his first conviction to his arrest in this case, Bell has plagued the community. He has used guns, sold drugs, trafficked

women, and committed murder. He chose to continue to commit crimes when given parole and a chance to become a productive member of society. At this point, the only way to protect the public from Darrick Bell is an extensive term of incarceration.

## IV.    CONCLUSION

The government moves this Honorable Court to sentence Darrick Bell to 35 years.

Respectfully Submitted,

DAWN N. ISON
UNITED STATES ATTORNEY

s/*Matthew Roth*
Matthew Roth
Blake Hatlem
Lisandra Fernandez-Silber
Jerome Gorgon
Assistant United States Attorneys
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
313-226-9186
Matthew.Roth2@usdoj.gov

Dated:  March 25, 2024

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 25, 2024 the foregoing document was electronically filed with the Clerk of the Court using CM/ECF, for uploading and service by electronic notice to counsel and parties authorized to receive electronically Notices of Electronic Filing.

s/*Matthew Roth*
Matthew Roth
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
313-226-9186
Matthew.Roth2@usdoj.gov