# US DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION-DETROIT

**UNITED STATES OF AMERICA**

      **Plaintiff,**

v.                                                             **Case No. 17-20183**
                                                              **Hon. Mark Goldsmith**

**D-1 DARRICK BELL**

      **Defendant.**

| UNITED STATES ATTORNEY | AMBERG & AMBERG, PLLC |
|---|---|
| Dawn Ison (P43111) | James W. Amberg (P68564) |
| Matt Roth, Blake Hatlem | Attorneys for D-1 Darrick Bell |
| Attorneys for the Government | 32121 Woodward Ave, Ste PH |
| 211 W. Fort Street, Suite 2001 | Royal Oak, MI 48073 |
| Detroit, MI | 248.681.6255 office |
| 313.226.9100 office | 248.681.0115 fax |
| | www.amberglaw.net |

## DARRICK BELL'S SENTENCING MEMORANDUM

Now comes Darrick Bell, by his attorney James Amberg, by his attorney, and respectfully provides the following memorandum in support of a fair sentence.

### Introduction

Mr. Bell was found guilty of conspiring to distribute a controlled substance, possessing with the intent to distribute a controlled substance, and maintaining a drug premises. These drug charges were not the focal point of the trial. Instead, the Government's main focus was on the sex trafficking counts, to which Mr. Bell was acquitted of one and the Jury hung on the rest. It is requested that the Court not treat Mr. Bell's sentencing as a chance to exact punishment for a sex trafficking case the Government could not prove against Mr. Bell and instead

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVENUE, PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET
(248) 681-6255

simply impose a sentence consistent with others convicted of a small to mid-level drug conspiracy.

## The Presentence Report Narrative

Although Mr. Bell was acquitted of one count of sex trafficking and the Government choosing to dismiss the remaining hung counts, the Government's endless narrative of this case being a "sex-trafficking" case is repeated throughout the presentence report. Statements in the report such as Mr. Bell "exploit[ing] the addictions of the human trafficking victims for financial gain" and how he supposedly "earned money through human trafficking" were rejected by the Jury and capitulated by the Government in their dismissal of the hung counts. (ECF 1020; Pg ID 11089) Yet the Probation Department takes the same stance that the Government, for good reason, could not prove. Simply put, there was never a sex trafficking conspiracy involving Mr. Bell. Is it the Probation Department's job to advocate on behalf of the Government's failed position? The individuals involved in prostitution were not sex trafficked, as throughout the trial, the alleged "victims" indicated their actions were not against their will. Further, the originating "victim's" story of abuse at the hands of Mr. Bell was thoroughly debunked, as was reflected by the Jury's acquittal of her specific count. Nonetheless, the PSIR is replete with references to Mr. Bell being a human trafficker, which of course he is not.

## Objection One – Acquitted Conduct

As the PSIR reflects, Mr. Bell objects to the use of acquitted conduct and dismissed conduct by this Court in fashioning a sentence. As the law stands today, the Court may consider uncharged conduct or even acquitted conduct that is proven by a preponderance of the evidence when sentencing a defendant. *United*

2

*States v White*, 551 F3d 381, 385 (6th Cir 2008)(en banc)  The *White* case relied heavily on the Supreme Court's decision in *United States v Watts*, 519 US 148 (1997)(per curiam)  This however may change, as the practice of using acquitted conduct at sentencing was recently visited and discussed by the Supreme Court in *McClinton v United States*, 143 S Ct 2400 (2023)  The *McClinton* case involved the McClinton being acquitted of murder but convicted of robbery.  *Id* at 2401  At sentencing, the court found McClinton had killed his friend and his guidelines skyrocketed.  *Id*  Although denying Certiorari for other reasons that will be discussed below, Judge Sotomayor gave a lengthy explanation respecting the misgivings of using acquitted conduct at sentencing.  First, the Justice reasoned that "[a]s many jurists have noted, the use of acquitted conduct to increase a defendant's Sentencing Guidelines range and sentence raises important questions that go to the fairness and perceived fairness of the criminal justice system." *Id* at 2401  The Justice then referenced various dissents from Justices Scalia, Ginsburg, and Thomas, as well as Justices Kavanaugh and Kennedy also writing in relation to the unfairness of the practice.  Justice Sotomayor went on to provide specific reasons for this, including: an acquittal may "reflect a jury's conclusion that the State's witnesses were lying and that the defendant is innocent of the alleged crime;" a "jury trial is no mere procedural formality, but a fundamental reservation of power in our constitutional structure;" "concerns about procedural fairness and accuracy when the State gets a second bite at the apple with evidence that did not convince the jury coupled with a lower standard of proof;" and that "acquitted-conduct sentencing also raises questions about the public's perception that justice is being done, a concern that is vital to the legitimacy of the criminal justice system." *Id* at 2402-2403

Justice Sotomayor then brought forward the reason why the Court was likely not granting Certiorari, namely that "[t]he Sentencing Commission, which is responsible for the Sentencing Guidelines, has announced that it will resolve questions around acquitted-conduct sentencing in the coming year. If the Commission does not act expeditiously or chooses not to act, however, this Court may need to take up the constitutional issues presented." *Id* at 2403 (emphasis added) Justices Kavanaugh, Gorsuch, and Barrett in their denial of Certiorari, also indicated it would be " appropriate for this Court to wait for the Sentencing Commission's determination before the Court decides whether to grant certiorari in a case involving the use of acquitted conduct."

Although promising, rather than make these vital changes to the guidelines, the Sentencing Commission "took up the issue during last year's abbreviated amendment cycle but determined that more time and public comment was needed before promulgating amendments." (December 14, 2023, Sentencing Commission News Release entitled 'US Sentencing Commission Seeks Comment on Proposals Addressing the Impact of Acquitted Conduct, Youthful Convictions, and Other Issues; https://www.ussc.gov/about/news/press-releases/december-14-2023)

The Supreme Court has never squarely addressed whether a sentencing judge's consideration of acquitted conduct to enhance a defendant's sentence violates the Due Process Clause of the Fifth Amendment or the Sixth Amendment's guarantee of trial by jury. In *Watts*, a divided Court held in a summary disposition that considering acquitted conduct at sentencing does not offend the Double Jeopardy Clause of the Fifth Amendment. *Watts*, supra, 519 US at 154 The Supreme Court later emphasized that Watts "presented a very narrow question regarding the interaction of the [US Sentencing] Guidelines with the Double Jeopardy Clause, and did not even have the benefit of full briefing or oral

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVENUE, PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET
(248) 681-6255

4

argument." *United States v Booker*, 543 US 220, 240 n4 (2005)  Thus, the *Watts* Court did not have occasion to consider whether the Due Process Clause of the Fifth Amendment or the Sixth Amendment's jury-trial guarantee forbid the use of acquitted conduct at sentencing.  Yet for decades, "[n]umerous courts of appeal assume[d] that *Watts* controls the outcome of both the Fifth and Sixth Amendment challenges to the use of acquitted conduct," *White*, supra, 551 F3d at 392 n2 (6th Cir 2008) (en banc)(Merritt, J., dissenting, joined by five others)

It seems highly likely that it's either going to be the Supreme Court or the Guidelines Commission that puts the clearly unconstitutional practice of using acquitted conduct at sentencing.  In Mr. Bell's case, as with the trial, it seems as though the jury-rejected sex trafficking and human trafficking conspiracy is front and center.  Contrary to the apparent hopes of the Probation Department, it is entirely improper for the Court to consider this in sentencing.  If the Court does, why should we ever even bother with a jury trial at all?  Mr. Bell went to trial because he was adamant that he was not a sex trafficker or human trafficker.  And guess what, the Jury thought he wasn't either.

So what should the Court do?  The Government would love nothing more than to have the Court hammer Mr. Bell under their theory of the case.  There's just one little problem, and it looks like this:

Not Guilty __X__    (ECF 896; PG Id 6622)

Will the Court reject the Jury's verdict?  Mr. Bell argues not only that it cannot, but it should not, as it makes it pointless for a defendant to exercise their trial rights on any case in which the Government charges are either overkill or in this case, woefully wrong yet contain other charges that will much more likely find

5

convictions. Mr. Bell fought the injustice of his human trafficking charges and won, yet it seems as though that is a mere irrelevant afterthought. For all of these reasons, Mr. Bell requests the Court reject what is obviously wrong and only sentence him based on the drug conspiracy to which he was convicted.

**Objection Two – Firearm Enhancement**

The PSIR scores Mr. Bell with an additional 2 points per USSG §2D1.1(b)(1) for the reason that according to the PSIR, "a firearm was found to be used over the course of the conspiracy to protect narcotics and to further the conspiracy through threats of violence." (ECF 1020; Pg ID 11076) For this enhancement to apply, the government must show "by a preponderance of the evidence that (1) the defendant actually or constructively possessed the weapon, and (2) such possession was during the commission of the offense." *United States v Greeno*, 679 F3d 510, 514 (6th Cir 2012)(internal citations omitted) In the context of a conspiracy, "if a member of the conspiracy possessed the firearm and the member's possession was reasonably foreseeable by the other members in the conspiracy." *United States v Clisby*, 636 Fed Appx 243, 248 (6th Cir 2016) As such, "the government must prove by a preponderance that a co-conspirator's possession in furtherance of the conspiracy was reasonably foreseeable." *Id*

The Sixth Circuit has "explicitly rejected the fiction that a firearm's presence always will be foreseeable to persons participating in illegal drug transactions." *United States v Woods*, 604 F3d 286, 291 (6th Cir 2010)(internal quotation marks removed); see also *United States v. Wade*, 318 F3d 698, 702 (6th Cir 2003)("We may infer that a defendant in a drug conspiracy should have foreseen his coconspirator's firearm possession, but the evidence supporting that inference must be more than a mere generalized presumption that drug transactions involve guns.") At a minimum, "there [must] be objective evidence that the defendant at

6

least knew it was reasonably probable that his coconspirator would be armed." *Woods*, 604 F3d at 291 (alteration removed)

There is no evidence presented that Mr. Bell carried a firearm in furtherance of the convicted drug conspiracy. This leaves us with the actions of his alleged co-conspirators. In the Government's response to the PSI objections, it argues that Avery and others had guns in their rooms, that a shootout took place after Avery and Randol were robbed, and that Mr. Bell may have discussed the robbery with Gaggo. (ECF 1020; Pg ID 11093) However, these facts are not sufficient to establish a firearm enhancement. The idea that the guns allegedly in possession of Avery and others were used to further the conspiracy fails to grasp that many people have guns for personal protection, especially in high-crime neighborhoods. The fact that guns were used allegedly in response to a robbery likewise are not actions in furtherance of a drug conspiracy. Finally, there is no real evidence that Mr. Bell actually knew these guns were present or being used, thus the 2-point addition is in error.

**Objection Three – Threat of Violence**

The PSIR scores 2 points per USSG §2D1.1(b)(2) "[i]f the defendant used violence, made a credible threat to use violence, or directed the use of violence." *Id* First, it appears that the PSIR is discussing testimony from A.P. which, beyond not being credible, was directed toward the failed sex trafficking charges. Further, there is no credible evidence that Mr. Bell actually either committed or directed any other alleged "drug conspirator" to use violence in any way. Once again, the PSIR reflects an effort to use the acquitted and dismissed conduct to grossly over punish Mr. Bell for his actual convictions.

7

### Objection Four – Maintaining the Victory Inn

The PSIR requests the Court find a 2-point enhancement per USSG §2D1.1(b)(12), if "the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." *Id*  The PSIR claims that Mr. Bell "maintained a premises located at the Victory Inn Motel for the purposes of distributed narcotics."  (ECF 1020; Pg ID 11076)  This "enhancement applies to anyone who (1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." *United States v Bell*, 766 F3d 634, 636–37 (6th Cir 2014)(internal citation omitted)  The application note explains that a drug trade "need not be the sole purpose" for maintaining the place. USSG § 2D1.1 cmt n 17  It need only amount to a "primary or principal use[ ]," as opposed to an "incidental or collateral use[ ]." *Id*

The primary or principal use of the rooms in the Victory Inn that were allegedly connected to Mr. Bell were not to further the convicted drug conspiracy, but instead to allow a place to stay for the individuals who stayed there.  And this is if it is believed that Mr. Bell actually had the rooms, as this also was an emphasized part of the rejected sex trafficking conspiracy.  Thus the application of the 2 points for USSG §2D1.1(b)(12) was in error.

### Objection Five – Leadership

The PSIR scores 4 points for a leadership role in which the PSIR claims Mr. Bell was in charge of four or more individuals within the drug conspiracy.  USSG §3B1.1(a) indicates that a four-level enhancement is appropriate "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." *Id*, *United States v Wells*, 55 F4th 1086, 1092 (6th Cir 2022)  The Government must establish by a preponderance of

8

the evidence that the leadership enhancement under §3B1.1(a) applies. *Wells*, at 1092–93

> "In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others…." USSG §3B1.1 app note 4

> In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of §3B1.1(c). USSG §3B1.1 Commentary Background

> Per USSG §3B1.1 Aggravating Role, the following applies:

> "(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

> (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels." *Id*

It is argued that Mr. Bell was not the leader of some vast drug enterprise. His drug allegations appear to involve selling drugs to individuals in a buyer seller relationship. Further, it is unclear who the five people are that Mr. Bell supposedly organized or supervised. As such, it is argued that the 4 point enhancement is inappropriate in this circumstance.

**Objection Six – Criminal History**

The PSIR scores Mr. Bell with 16 criminal history points. It is argued that most of these points are improperly scored. USSG 4A1.2(e)(1) states that "[a]ny prior sentence of imprisonment exceeding one year and one month that was

9

imposed within fifteen years of the defendant's commencement of the instant offense is counted." *Id* Important to this case, that same provision also instructs to "count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period." *Id* The Second Superseding Indictment indicates a date range for the drug conspiracy from 2015 through January 12, 2017. (ECF 681; Pg ID 3863) Given this, it appears that the control date for the 15 years would be January 1, 2000.

    Mr. Bell's prior criminal history involves the following:

1. A 1989 felonious assault with a statutory four-year maximum sentence (1,460 days). Per the PSIR, Mr. Bell served time between 7/18/1990 to 1/29/1992 (560 days), then 10/6/1993 to 5/16/1994 (222 days), and was incarcerated for the last time in the sentence on 11/29/1994. These numbers reflect his maximum sentence allowable to be ended on October 9, 1996, well before the January 1, 2000, 15-year cutoff.

2. A 1989 weapons case with a statutory four-year maximum sentence (1,460 days). Per the PSIR, Mr. Bell served time between 7/18/1990 to 1/29/1992 (560 days), then 10/6/1993 to 5/16/1994 (222 days), and was incarcerated for the last time in the sentence on 11/29/1994. These numbers reflect his maximum sentence allowable to be ended on October 9, 1996, well before the January 1, 2000, 15-year cutoff.

3. A 1990 controlled substance case with a statutory five-year maximum sentence (1,825 days). Per the PSIR, Mr. Bell served time between 7/18/1990 to 1/29/1992 (560 days), then 10/6/1993 to 5/16/1994 (222 days), and was incarcerated for the last time in the sentence on

10

11/29/1994.  These numbers reflect his maximum sentence allowable to be ended on October 7, 1997, well before the January 1, 2000, 15-year cutoff.

4. A 1993 weapons charge with a statutory five-year maximum.  Per the PSIR, Mr. Bell served time between 10/5/1993 to 5/16/1994 (222 days), and was incarcerated for the last time in the sentence on 11/29/1994.  These numbers reflect his maximum sentence allowable to be ended on April 20, 1999, approximately seven months before the January 1, 2000, 15-year cutoff.

The PSIR nonetheless scored all of these incarceration sentences with three points each.  The PSIR's theory justifying this is that "[d]ue to the defendant's continuous parole violations, absconding, and escape he did not complete any of the sentences being objected to until he entered the 15-year period prior to the instant offense." (ECF 1020; Pg ID 11096)  But this is simply not true.  Mr. Bell served the maximum sentences for all of these above crimes prior to the January 1, 2000 date, so it would be an impossibility that he did not complete his sentence.  There is nothing that indicates these sentences were not imposed concurrent to each other.  What appears to have happened is that Mr. Bell accrued a 2nd Degree Murder conviction in which he served time beyond the statutory maximums of each of the aforementioned convictions.  As such, his criminal history score is a 4, which places him as a category III criminal history.

### *The 18 USC 3553(A) Factors*

**Nature and Circumstances of the Offense**

Narcotic trafficking is a serious issue.  The mandatory ten-year prison sentence reflects this.  Even if the mandatory ten-year sentence is given, Mr. Bell will be 65 years old upon release.  The underlying drug conspiracy involved what

11

are arguably small amounts of crack cocaine. But for the failed sex trafficking charges, Mr. Bell's case would have been a routine drug conspiracy case.

### The History and Characteristics of Mr. Bell

Mr. Bell has lived a difficult life filled with substance abuse. He hopes to take the RDAP program and participate in other programs to help him transition to a law-abiding life. He is hopeful for his future and plans on a future that does not involve crime.

### Adequate Deterrence

Mr. Bell will receive a sentence of at least ten years. This is a significant sentence.

### Protecting the Public

Mr. Bell will be in retirement age when he is released from prison. Coupled with the numerous BOP programs that offer help to inmates that want to change for the better, Mr. Bell will not be a danger to the public when released.

### Rehabilitation

The BOP offers far greater rehabilitative programs than MDOC. Mr. Bell wishes to take these programs in the hope of rehabilitation.

### County Incarceration

Mr. Bell, for the majority of his sentence, was incarcerated in various county jails. These types of facilities are meant for the town drunk to sleep off a few days of criminal activities, not to house somebody for years. County jail is isolating, contains little to no programs, and does not offer the type of beneficial freedoms that actual prison facilities offer. Because of this, it is argued that the Court can consider this time that Mr. Bell served to be more difficult than a normal incarceration sentence.

### The Justice Department's Support of Ending the Crack/Cocaine Disparity

In Mr. Bell's case, his punishments are tied in directly with the distribution of crack cocaine. In fact, his converted drug weight for 280 grams of crack cocaine is 999.88kg. However, if this was simply cocaine, the converted weight would be 56 kg. This ultimately would lead Mr. Bell's total converted drug weight of 24 when the heroin converted drug weight is entered.

As Attorney General Merrick Garland has represented, "[t]he Justice Department supports elimination of the crack-to-powder sentencing disparity and has testified before Congress in support of the EQUAL Act, S. 79, which would remove that disparity." (See **Exhibit A**, Attorney General Memorandum; December 16, 2022) Mr. Bell is glad that the Justice Department and he are on the same page when it comes to removing the disparity, which should be noted "the crack/powder disparity is simply not supported by science, as there are no significant pharmacological differences between the drugs: they are two forms of the same drug, with powder readily convertible into crack cocaine." (**Exhibit A**) Most importantly:

> "At sentencing, prosecutors should advocate for a sentence consistent with the guidelines for powder cocaine rather than crack cocaine. Where a court concludes that the crack cocaine guidelines apply, prosecutors should generally support a variance to the guidelines range that would apply to the comparable quantity of powder cocaine." (**Exhibit A**)

It is argued that the Court, like the Justice Department, should treat Mr. Bell's conviction without the crack disparity. With the removal of the added 4 points for leadership, 2 points for violence, 2 points for the firearm enhancement, and two points for maintaining, the end result is a level 24 with a criminal history category 3. This results in a guideline range of 63-78.

## Conclusion

Mr. Bell requests the Court sentence him to a term of less than 15 years. This sentence would have Mr. Bell leaving prison in his elder years. Is it necessary

to incarcerate him longer?  As he grows into old age, with the myriads of medical issues and other demands that this brings, at what point does enough is enough come into play?  It is for these reasons that he urges the Court to consider the 15 year or less sentence.

                              Respectfully submitted,

                              /s/*James W. Amberg*
                              AMBERG & AMBERG, PLLC
                              James W. Amberg P68564
                              Attorneys for Mr. Bell
                              32121 Woodward Ave. Suite PH
                              Royal Oak, MI 48073
Dated:  March 25, 2024               248.681.6255 office

### *Certificate of Service*

     I, James W. Amberg, attorney at law, certify that on March 9, 2024, I caused a copy of this Memorandum to be served upon the Clerk of the Court and Government via efile.

                              /s/  *James W. Amberg*
                              James W. Amberg (P68564)

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVENUE, PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET
(248) 681-6255

# EXHIBIT A



**Office of the Attorney General**
Washington, D. C. 20530

December 16, 2022

MEMORANDUM FOR ALL FEDERAL PROSECUTORS

FROM:                    THE ATTORNEY GENERAL

SUBJECT:            ADDITIONAL DEPARTMENT POLICIES REGARDING
                              CHARGING, PLEAS, AND SENTENCING IN DRUG CASES

General Department policies regarding charging an offense, entering into a plea agreement, and making sentencing recommendations are set forth in *General Department Policies Regarding Charging, Pleas, and Sentencing* (2022) (hereinafter "General Policies Memorandum"). This memorandum provides additional, specific policies regarding charging, pleas, and sentencing in drug cases -- consistent with the priority the Department has placed on focusing its prosecutorial resources on combatting violent crime.

### CHARGING DOCUMENTS AND PLEA AGREEMENTS

**Mandatory Minimum Offenses**

As stated in the General Policies Memorandum, "charges that subject a defendant to a mandatory minimum sentence should ordinarily be reserved for instances in which the remaining charges … would not sufficiently reflect the seriousness of the defendant's criminal conduct, danger to the community, harm to victims" and "such purposes of the criminal law as punishment, protection of the public, specific and general deterrence, and rehabilitation." General Policies Memorandum at 2, 3.

This policy applies with particular force in drug cases brought under Title 21 of the United States Code, where mandatory minimum sentences based on drug type and quantity have resulted in disproportionately severe sentences for certain defendants and perceived and actual racial disparities in the criminal justice system. *See* Governor Asa Hutchinson, Statement before the Senate Judiciary Committee 2 (June 22, 2021); Attorney General Holder, *Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases* (2013); United States Sentencing Commission, *Mandatory Minimum Penalties for Drug Offenses in the Federal Criminal Justice System* 8, 26, 57 (Oct. 2017). Accordingly, in cases in which Title 21 mandatory minimum sentences are applicable based on drug type and quantity, prosecutors should decline to charge the quantity necessary to trigger a mandatory minimum sentence if the defendant satisfies all of the following criteria:

Memorandum for All Federal Prosecutors
Subject:  Additional Department Policies Regarding
  Charging, Pleas, and Sentencing in Drug Cases                                Page 2

- The defendant's relevant conduct does not involve: the use of violence, the direction to another to use violence, the credible threat of violence, the possession of a weapon, the trafficking of drugs to or with minors, or the death or serious bodily injury of any person;
- The defendant does not have a significant managerial role in the trafficking of significant quantities of drugs;
- The defendant does not have significant ties to a large-scale criminal organization or cartel, or to a violent gang; and
- The defendant does not have a significant history of criminal activity that involved the use or threat of violence, personal involvement on multiple occasions in the distribution of significant quantities of illegal drugs, or possession of illegal firearms.

In making the above assessment, prosecutors should consider whether the above criteria are satisfied without regard to whether the defendant would be eligible for a sentence below a mandatory minimum term based on application of the safety valve, 18 U.S.C. § 3553(f), or on substantial assistance under 18 U.S.C. § 3553(e).

In cases in which prosecutors determine that some but not all of the criteria are satisfied, prosecutors should not automatically charge the quantity necessary to trigger the mandatory minimum, but rather weigh the considerations set forth in this memorandum and the General Policies Memorandum to carefully determine, through the exercise of their discretion and in consultation with their supervisors, whether a Title 21 charge with a mandatory minimum sentence is appropriate.[1]

As set forth in the General Policies Memorandum, any decision to include a mandatory minimum charge in a charging document or plea agreement must be approved by a supervisory attorney as designated by the United States Attorney or Assistant Attorney General for the relevant litigating division.

If information sufficient to determine that all of the criteria above are satisfied is available at the time initial charges are filed, prosecutors should decline to pursue Title 21 charges triggering a mandatory minimum sentence. If this information is not yet available, prosecutors may file charges involving these mandatory minimum statutes pending further information. If information that the criteria are satisfied is subsequently obtained, prosecutors should pursue a disposition that does not require a Title 21 mandatory minimum sentence. For example, a prosecutor could ask the grand jury to supersede the indictment with charges that do not carry mandatory minimum sentences; a defendant could plead guilty to a lesser included offense that does not carry the mandatory minimum; or a defendant could waive indictment and plead guilty to an information that does not charge the quantity necessary to trigger the mandatory minimum.

---

[1] For example, in a case involving a defendant who serves only as a "drug mule," but who arguably does not satisfy all of the criteria discussed above, the balance of considerations may still weigh against the filing of a Title 21 charge carrying a mandatory minimum sentence.

Memorandum for All Federal Prosecutors
Subject: Additional Department Policies Regarding
Charging, Pleas, and Sentencing in Drug Cases      Page 3

**Recidivist Enhancements**

In deciding whether to file an information under 21 U.S.C. § 851 requiring imposition of enhanced statutory penalties, prosecutors in drug cases should be guided by the same criteria discussed above for charging mandatory minimum offenses, as well as whether the filing would create a significant and unwarranted sentencing disparity with equally or more culpable co-defendants. Prosecutors are encouraged to make the Section 851 determination, and to file any such a notice, at the time the case is charged or as soon as possible thereafter.

As with any filing, a Section 851 enhancement should not be filed simply to exert leverage to induce a plea or because the defendant elected to exercise the right to trial. General Policies Memorandum at 3.

## SENTENCING RECOMMENDATIONS

The General Policies Memorandum advises that, although in many cases the appropriate balance among the 18 U.S.C. § 3553(a) factors will lead to a recommendation for a sentence within the advisory range resulting from the application of the Sentencing Guidelines, there are cases in which such a sentence may not be "proportional to the seriousness of the defendant's conduct" or "achieve the purposes of criminal sentencing as articulated in 18 U.S.C. § 3553(a)." General Policies Memorandum at 5. In such cases, prosecutors may conclude that a request for a departure or variance above or below the guidelines range is warranted. *Id.*

In the context of drug cases, requests for departures or variances may be particularly justified in the following circumstances:

- **Certain cases in which the guidelines range does not adequately reflect the defendant's crime and culpability**: At times, a low-level seller in a large-scale drug organization may be held responsible under the relevant conduct provisions of the Sentencing Guidelines for a large quantity of drugs that produces an advisory range near the top of the sentencing table. In such cases, prosecutors should consider supporting a downward departure or variance, particularly where all or most of the criteria listed on the first two pages of this memorandum are satisfied. Conversely, where the criteria are satisfied and yet the penalty yielded by the advisory guidelines range is not proportional to the seriousness of the defendant's conduct, prosecutors may consider seeking an upward departure or variance.

- **Certain cases in which the career offender guidelines range does not adequately reflect the defendant's crime and culpability:** Similar consideration should be given in a case in which the defendant is subject to sentencing under the career offender guideline, *see* U.S.S.G. § 4B1.1, which is designed to trigger guideline ranges at or near statutory maximum sentences. In a case in which all or most of the listed criteria are present, and the defendant's status as a career offender is predicated only on the current and previous commission of nonviolent controlled substance offenses, prosecutors should consider

Case 2:17-cr-20183-MAG-RSW ECF No. 1053, PageID.11515 Filed 03/25/24 Page 19 of 20

Memorandum for All Federal Prosecutors
Subject:  Additional Department Policies Regarding
               Charging, Pleas, and Sentencing in Drug Cases                                                   Page 4

supporting a downward variance to the guidelines range that would apply in the absence of career offender status.[2] (For purposes of this memorandum, nonviolent offenses are those that do not involve the actual or threatened use of a weapon or other means of violence.) Conversely, if the defendant's prior convictions involved the actual or threatened use of violence, but the crimes do not qualify as career offender predicates under the "categorical approach," if appropriate prosecutors may consider advocating for an upward variance, including toward the career offender range.

Whatever the ultimate sentencing recommendation, prosecutors must always be candid with the court, the probation office, and the public as to the full extent of the defendant's conduct and culpability, including the type and quantity of drugs involved in the offense and the quantity attributable to the defendant's role in the offense, even if the charging document lacks such specificity.

## CHARGING, PLEAS, AND SENTENCING IN CRACK COCAINE CASES

The Justice Department supports elimination of the crack-to-powder sentencing disparity and has testified before Congress in support of the EQUAL Act, S. 79, which would remove that disparity. As the Department has explained: "First, the crack/powder disparity is simply not supported by science, as there are no significant pharmacological differences between the drugs: they are two forms of the same drug, with powder readily convertible into crack cocaine. Second, as documented by the Sentencing Commission, the crack/powder sentencing differential is still responsible for unwarranted racial disparities in sentencing. Third, the higher penalties for crack cocaine offenses are not necessary to achieve (and actually undermine) our law enforcement priorities, as there are other tools more appropriately tailored to that end." Justice Department Statement, Senate Judiciary Committee 6 (June 22, 2021).[3]

Accordingly, prosecutors in crack cocaine cases should take the following steps to promote the equivalent treatment of crack and powder cocaine offenses.

---

[2] The Sentencing Commission has documented the increasing frequency of sentencing variances below a career offender range, particularly for those whose career offender status rested on drug offenses rather than violent crimes. The Commission reported that, by fiscal year 2014, judges imposed a sentence below the career offender range in roughly 75% of drug-based career offender cases, frequently choosing a sentence close to the non-career offender drug guideline. United States Sentencing Commission, *Report to the Congress: Career Offender Enhancements* 35 (2016).

[3] *See* Testimony of Acting ONDCP Director, Senate Judiciary Committee, June 22, 2021; U.S. Sentencing Commission Report 1995 (recommending sentencing guidelines amendment that would have equalized the guidelines penalties for powder and crack cocaine offenses based solely on drug quantities).

Memorandum for All Federal Prosecutors
Subject:  Additional Department Policies Regarding
         Charging, Pleas, and Sentencing in Drug Cases                           Page 5

If charging a mandatory minimum term of imprisonment under Title 21 for a drug offense involving crack cocaine is deemed warranted under this memorandum, prosecutors should charge the pertinent statutory quantities that apply to powder cocaine offenses. The Criminal Division and the Executive Office for United States Attorneys will issue further guidance on how to structure such charges.

At sentencing, prosecutors should advocate for a sentence consistent with the guidelines for powder cocaine rather than crack cocaine. Where a court concludes that the crack cocaine guidelines apply, prosecutors should generally support a variance to the guidelines range that would apply to the comparable quantity of powder cocaine.

As noted above, prosecutors must always be candid with the court, the probation office, and the public as to the full extent of the defendant's conduct and culpability, including the type and quantity of drugs involved in the offense, even if the charging document lacks such specificity.[4]

---

[4] The policies contained in this memorandum, and internal office procedures adopted pursuant thereto, are intended solely for the guidance of attorneys for the government. They are not intended to create a substantive or procedural right or benefit, enforceable at law, and may not be relied upon by a party to litigation with the United States. Justice Manual § 9-27.150 (updated Feb. 2018); *see United States v. Caceres*, 440 U.S. 741 (1979).