UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,              CASE NO. 17-20183

-v-                                HON. MARK A. GOLDSMITH

D-1 DARRICK BELL,

                Defendant.

_____/

## GOVERNMENT'S SUPPLEMENTAL MEMORANDUM AS TO DRUG QUANTITY ATTRIBUTABLE TO DARRICK BELL

On June 10, 2024, the Court directed the government to write a memorandum to the Probation Department. The memorandum was to explain how the government calculated the quantity of drugs, attributable to Bell, in determining his advisory guideline range. On June 14, 2024, the government provided the memorandum to the Probation Department. On June 25, 2024, the Probation Department issued a memorandum outlining their calculations as to the quantity of drugs attributable to Bell. Bell did not respond to either submission.

On July 18, 2024, the Court directed the parties to respond to the Probation Department's findings. Below, the Court will find the government's response.

## I.  Converted drug weight and base offense levels as calculated by the government and probation.

The government originally calculated a total converted drug weight of 10,732 kilograms, a base offense level of 34. USSG §2D1.1(c)(3). After reviewing the total converted drug weight calculated by the Probation Department, the government determined the total converted drug weight was 10,650.2 kilograms. To reach a level 34, the converted drug weight must be at least 10,000 kilograms but less than 30,000 kilograms. USSG §2D1.1(c)(3).

The Probation Department calculated a total converted drug weight of 9,876.40 kilograms, a base offense level of 32. USSG §2D1.1(c)(4). To reach a level 32, the converted drug weight must be at least 3,000 kilograms but less than 10,000 kilograms.

## II.  The standard of proof and relevant caselaw.

The government must prove the weight of any drugs by a preponderance of the evidence. *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000). The Court must choose an estimate that

protects a defendant from a drug quantity higher than what they are actually responsible for. *United States v. Jeross*, 521 F.3d 562, 578 (6th Cir. 2008) (internal citations omitted). The evidence "that the district court relies on to support the estimate 'must have a minimal level of reliability' and the court should 'err on the side of caution in making its estimate.'" *United States v. Histed*, No. 22-2080, 2024 WL 726245, at *3 (6th Cir. Feb. 22, 2024) (internal citations omitted). The Sixth Circuit has "affirmed district courts' drug-quantity determinations that used ascertainable methodologies to arrive at a conservative estimate of drugs." *Id.* at *4.

**III.   The Probation Department's calculation of the quantity of cocaine base, distributed by Avery, is inaccurate.**

   A.   <u>The government and the Probation Department relied on the same facts and employed the same methodology in the drug quantity calculations</u>.

The government and the Probation Department agreed on how to calculate the quantity of drugs attributable to Bell by examining what Bell's coconspirators distributed as part of his drug trafficking conspiracy. From reviewing the trial transcripts, the government and probation used the following variables:  (1) how long was a coconspirator at the Victory Inn; (2) the amount of drugs given, by Bell,

to the individual coconspirator; and (3) the time it took the coconspirator to distribute that amount and reup with Bell.

The government and probation also agreed on other important points. First, the testimony of Bryant Daugherty was the most informative on the issue of who distributed what amounts. Second, from Daugherty's testimony, Avery sold two ounces (56.7 grams) of cocaine base every four days. Third, that Bryant Daugherty's testimony could only apply to the time period close to when Daugherty was at the Victory Inn and had direct knowledge of Avery's drug distribution amounts. To assist the Court, below is a brief summary of Daugherty's relevant testimony.

B.   Daugherty's testimony.

The women at the Victory Inn purchased Bell's drugs from Daugherty, Avery, and Randol. (ECF No. 922, PageID.8800). Daugherty testified they bought from him "multiple times a day." (ECF No. 922, PageID.8800). Daugherty purchased drugs from Bell or Avery. (ECF No. 922, PageID.8810). He started selling heroin because the "girls wanted it." (ECF No. 922, PageID.8813). Bell provided Daugherty an eight ball (3 grams) to a quarter (6 grams) of crack every three or four

-4-

days. (ECF No. 922, PageID.8814). Other than Bell, Avery sold the most crack at the Victory Inn. (ECF No. 922, PageID.8816). Daugherty was in Avery's room, saw his transactions, quantity of drugs, and room traffic. (ECF No. 922, PageID.8816). Avery sold higher amounts; two to four and a half ounces (56.6 to 127.5 grams) of crack cocaine. (ECF No. 922, PageID.8815). Avery preceded Daugherty's arrival at the Victory Inn. (ECF No. 922, PageID.8787).

As to when Daugherty arrived at the Victory Inn, he made the following statements:

- He started working full time as a drug dealer at the Victory Inn between mid-summer and late summer of 2016. (ECF No. 922, PageID.8794);

- From his arrival in the summer until his arrest on January 12, 2017, he was always at the Victory Inn. (ECF No. 922, PageID.8813);

- Over his four to five months at the Victory Inn, Daugherty sold crack cocaine until he started also selling heroin. (ECF No. 922, PageID.8813-14); and

&#9642;   He started living at the Victory Inn at the end of the summer 2016. (ECF No. 922, PageID.8887-8888).

C.   <u>The calculations</u>.

Daugherty's testimony of when he arrived at the Victory Inn was not precise. The Probation Department focused on the testimony that Daugherty was at the Victory Inn for four months. Working backwards four months from January 12, 2017 (when Daugherty was arrested), the Probation Department put Daugherty at the Victory Inn from September 12, 2016, to January 12, 2017. That put Daugherty at the Victory Inn for 122 days.

The government focused on Daugherty's testimony that he started working at the Victory Inn "mid-summer to late summer." Interpreting the testimony conservatively, the government determined he arrived September 1, 2016, and stayed until he was arrested on January 12, 2017. Under the government's interpretation of his testimony, Daugherty was at the Victory Inn for 134 days. Twelve additional days than determined by probation.

As to Avery, probation used Daugherty's "arrival date" of September 12, 2016, in calculating the quantity Avery distributed as

-6-

part of Bell's drug trafficking conspiracy. Accepting, arguendo, probation's very conservative position that Daugherty arrived at the Victory Inn on September 12, 2016, that same date cannot apply to Avery. The government's position is that probation should have used September 1, 2016, when calculating Avery's distribution quantity. Below is a table showing the government's and probation's calculations using the different dates for Avery.

Summary of Cocaine Base Calculations – Avery

| Category | Probation's Calculations | Government's Calculations |
|---|---|---|
| Days at Victory Inn | 122 (9/12/16 to 1/12/17) | 134 (9/1/16 to 1/12/17) |
| Frequency of distribution | 30.5 days (122 days / every 4th day) | 33.5 days (134 days / every 4th day) |
| Quantity and frequency | 56.7 grams x 30.5 days | 56.7[1] grams x 33.5 days |
| **Totals** | **1,729.35 grams** | **1,899.45 grams** |

As outlined below, there was significant evidence presented at trial that Avery arrived at the Victory Inn, and started selling drugs, well before Daugherty. Using September 1 will account for the fact that

---

[1] The government initially used 56.6 grams, but has since adopted probation's use of 56.7 grams.

-7-

Avery was at the Victory Inn before Daugherty. It will also remain within the time frame where Daugherty's testimony—as to Avery's quantity of distribution—is instructive and reliable.

Most importantly, the higher quantity, as it relates to Avery's distribution of cocaine base, will hold Bell more accountable for Avery's role as his "right hand man". Further, that Avery arrived before, and sold drugs for a longer period of time, for Bell, at the Victory Inn.

D.   There was significant testimony putting Avery selling drugs at the Victory Inn before Daugherty arrived.

The evidence at trial proved that Avery arrived, and sold cocaine base at the Victory Inn, before Bell brought Daugherty to the Victory Inn.

Amanda Pauley was buying crack from Avery, at the Victory Inn, starting around the summer of 2015. (ECF No. 916, PageID.7824). The agents recovered room receipts showing Avery rented rooms from June 30, 2016, up to and past January 12, 2017. (ECF No. 925, PageID.9226-9227). Avery shared room 207, at the Victory Inn, with a woman from June 30 to July 7 of 2016. (ECF No. 918, PageID.8210-8211; Gov. Ex. 24.002). He shared a room, at the Victory Inn, with a different woman for July 15 and 16. (ECF No. 918, PageID.8212; Gov. Ex. 24.002). When

Daugherty first came to the Victory Inn, Avery was already there. (ECF
No. 922, PageID.8787).

Daugherty testified that all the drugs he sold at the Victory Inn
came from Bell or Avery. (ECF No. 922, PageID.8810). Bell was also
supplying Michael Randol and Harold Nero. (ECF No. 922,
PageID.8812). J.G. referred to Avery as Bell's "right-hand man." (ECF
No. 918, PageID.8235). Bell also described Avery, to Daugherty when he
arrived, as "his right-hand man." (ECF No. 922, PageID.8787). To put
Avery and Daugherty at the Victory Inn selling cocaine base for the
same amount of time, is simply inaccurate. The aforementioned
testimony are just a few pieces of evidence putting Avery at the Victory
Inn, selling drugs, before Daugherty.

Although Avery sold cocaine base for months, if not a year before
Daugherty arrived, the government only calculated twelve additional
days compared to probation's calculations. Calculating his quantity
from September 1, 2016, follows the Sixth Circuit's repeated
instructions to employ a conservative methodology when calculating
drug quantities. It also more accurately represents how much
additional cocaine base Avery—having distributed the drug for a longer

-9-

period of time—sold than Daugherty; a fact consistent with the evidence. It will also hold Bell accountable for Avery's bigger role in the drug trafficking conspiracy. Avery was the biggest drug dealer at the Victory Inn, [who] worked for Bell." (ECF No. 921, PageID.8689). To hold Avery accountable for selling drugs during the same time period of Daugherty, fails to hold Bell fully accountable for the volume of drugs he actually sold.

The Sixth Circuit requires a Court to make "a conservative assessment of drug quantity on the basis of [ ] evidence-testimony that both the court, and presumably the jury, found to be credible." *United States v. Copeland*, 321 F.3d 582, 607 (6th Cir. 2003). The evidence and testimony shows Avery, and in turn, Bell, distributed cocaine base for a longer period of time than what probation calculated.

Given the arguments above, the government calculated that Avery distributed 1,899.45 grams of cocaine that is attributable to Bell.

## IV. Probation's calculations for the quantity of heroin, distributed by Avery, should incorporate the September 1 date and include more users.

The government and probation used Daugherty's testimony to determine how much heroin Daugherty and Avery distributed on behalf

-10-

of Bell. For the Court's convenience, a summary of Daugherty's relevant testimony is below.

A.  <u>Daugherty's testimony as to the distribution of heroin</u>.

Bell provided heroin to Avery who, in turn, provided Daugherty a gram of heroin every three to four days. (ECF No. 922, PageID.8815, 8823, 8825). Daugherty paid $100 for a gram. (ECF No. 922, PageID.8823). He would turn the gram into 20 to 24 individual packs of heroin which he sold for $10 each ($200 or $240 total). (ECF No. 922, PageID.8823). The "girls mostly bought the heroin . . . ," they were the "primary customers . . . ." (ECF No. 922, PageID.8824).

The women spent $100 to a couple hundred dollars, throughout the day, depending "if they made enough money prostituting that they could afford to continue to buy that amount." (ECF No. 922, PageID.8824-25). A.P. testified she used heroin on a daily basis because "it was cheaper for me to do the heroin throughout the day that it was the crack . . . ." (ECF No. 916, PageID.7818). S.V. testified she used heroin multiple times in a 24-hour period. (ECF No. 920, PageID.8467-68). S.V. was high "at least 22 [hours]" a day. (ECF No. 920, PageID.8470). S.V. testified that (1) Avery had more than ten women

-11-

"doing sex dates and giving money" to Avery; and (2) Avery got his drugs from Bell. (ECF No. 920, PageID.8514-15).

Per Daugherty, the conspiracy controlled approximately 15 to 20 girls who stayed in the rooms at the Victory Inn. (ECF No. 922, PageID.8831-32). When Daugherty first arrived, he was introduced to 12 to 15 women who worked for Bell. (ECF No. 922, PageID.8796). A.P. testified that anywhere from 5 to 10 girls were doing dates and coming back to Avery's room for more drugs. (ECF No. 916, PageID.7846). A.P. told the jury that all of the women at the Victory Inn were addicts. (ECF No. 916, PageID.7845-7846). Daugherty testified that Avery would use the heroin to control the girls. (ECF No. 922, PageID.8834). Per Daugherty, the girls were supposed to buy their drugs from Daugherty, Avery, Randol, and, at times, Nero, or get "put out of the hotel. (ECF No. 922, PageID.8840).

B.   The calculations.

Based on the above testimony, probation concluded that, if Daugherty divided 1 gram into 24 packets, each packet was .04 grams. In calculating the quantity of heroin distributed by Avery, the probation used the following variables:

- five women purchased 24 packs of heroin a day;

- each pack contained .04 grams of heroin; and

- like the cocaine base, the starting date was September 12, 2016, ending on January 12, 2017, totaling 122 days.

Probation's calculations are that Avery sold 244 grams of heroin, attributable to Bell.

As to the quantity, the government believes that probation's use of .04 grams of heroin per packet is correct.

As to the timeframe, like the arguments related to the crack cocaine, Avery was at the Victory Inn way before Daugherty. The government believes that the starting date, supported by the evidence, is September 1, 2016. The earlier date holds Bell accountable for employing Avery, who sold more heroin, for a longer period of time, than Daugherty.

As to the number of women, the government argues that five women is too conservative of an estimate. Daugherty testified that 15 to 20 girls stayed in the rooms at the Victory Inn. He met 12 to 15 when he first arrived. And A.P. testified that anywhere from 5 to 10 girls were

doing dates and coming back to Avery's room for more drugs. A.P. also testified that all of the women at the Victory Inn were addicts. Daugherty testified that the women mostly bought, and were the primary customers for, heroin.

Of the three sets of numbers, probation used the lowest available number. The Sixth Circuit requires that the drug quantity estimate is conservative and based on evidence and testimony. The Sixth Circuit does not require the lowest number, especially when there is evidence that the number is lower than what the testimony at trial established. The Court, in order to take a conservative approach, is not required to close its eyes to what the totality of the evidence proved. As to the heroin, the government argues the Court should calculate Avery's drug quantity using seven women.

The median number between 5 women (A.P.'s lowest number) and 20 women (Daugherty's highest number) is 12.5. If the Court used 12 women in the calculation, that would assume a little less than half of the women living at the Victory Inn did not purchase heroin from Avery. The government, in an attempt to err on the lower end, reduced that number by five more women. Essentially, the government took the

position that only 1/3 of the women living at the Victory Inn purchased heroin from Avery, even though he was the biggest drug dealer under Bell. The government took this conservative approach even with all the testimony at trial as to the prevalent use of heroin by the women at the Victory Inn.

Using the government's numbers, the calculation is as follows:

- seven women purchased 24 packs of heroin a day;

- each pack contained .04 grams of heroin; and

- like the cocaine base, the starting date is September 1, 2016, ending on January 12, 2017, totaling 134 days.

The government's calculations are that Avery sold 375.2 grams of heroin which is attributable to Bell. Below are the different calculations proposed by probation and the government:

| Category | Probation's Calculations | Government's Calculations |
|---|---|---|
| **Days at Victory Inn** | 122<br>(9/12/16 to 1/12/17) | 134<br>(9/1/16 to 1/12/17) |
| Frequency of distribution | 122 days (women purchased heroin every day) | 134 days (women purchased heroin every day) |

| Quantity and frequency | 1 gram made into 24 packs = .04 grams/pack<br><br>Women spent $100 ($10/pack), she purchased .4 grams/day<br><br>.4 grams a day x 122 days = 48.8 grams per woman<br><br>5 women a day x 48.8 grams = 244 grams | 1 gram made 24 packs = .04 grams/pack<br><br>Women spent $100 ($10/pack), she purchased .4 grams a day<br><br>.4 grams a day x 134 days = 53.6 grams per woman<br><br>7 women a day x 53.6 grams = 375.2 grams |
|---|---|---|
| **Totals** | **244 grams** | **375.2 grams** |

## V.   Conclusion

Under the government calculations, Bell is responsible for the following:

| | |
|---|---|
| **Cocaine Base**<br><br>Converted drug weight: | 2839.95 grams (total)<br>x<br>3571 (USSG § 2D1.1 (n.8(D))<br>10,141.5 kilograms |
| **Heroin**<br><br>Converted drug weight | 508.7 grams<br><br>508.7 kilograms - (USSG § 2D1.1 (n.8(D)) |
| **Totals (cocaine base + heroin converted drug weight)** | 10,650.2 kilograms |
| **Base Offense Level** | 34 |

Based on the government's calculations, which includes the drugs sold by Daugherty, Avery, and Randol, Bell's base offense level is 34.

Respectfully Submitted,

DAWN N. ISON
UNITED STATES ATTORNEY

s/*Matthew Roth*
Matthew Roth
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
313-226-9186
Matthew.Roth2@usdoj.gov

Dated:  July 22, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on Monday, July 22, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send a notification of such filing to the opposing party's attorney(s) of record.

<div style="margin-left: 40%;">

*s/Matthew Roth*
Matthew Roth
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Matthew.Roth2@usdoj.gov
(313) 226-9186

</div>